**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael H. WEITZENHOFF and Thomas W. Mariani, Defendants–Appellants.**

Nos. 92–10105, 92–10108.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 11, 1993.

Decided Aug. 3, 1993.

Philip H. Lowenthal, Wailuku, HI, for defendant-appellant Weitzenhoff.

Peter C. Wolff, Jr., Honolulu, HI, for defendant-appellant Mariani.

Craig H. Nakamura, Asst. U.S. Atty., Honolulu, HI, for plaintiff-appellee.

Before: GOODWIN and FLETCHER, Circuit Judges, and HUFF,* District Judge.

FLETCHER, Circuit Judge:

Michael H. Weitzenhoff and Thomas W. Mariani, who managed the East Honolulu Community Services Sewage Treatment Plant, appeal their convictions for violations of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 et seq., contending that 1) the district court misconstrued the word "knowingly" under section 1319(c)(2) of the CWA; 2) the court improperly permitted witnesses to testify as to the meaning of the terms and provisions of the permit issued to the East Honolulu plant; 3) the court erred in concluding that the permit was not unconstitutionally vague; 4) evidence they sought to introduce concerning a regulation proposed by the EPA was improperly excluded; 5) the court erred in refusing their proposed instruction on entrapment by estoppel; and 6) the court should have granted a mistrial due to prosecutorial misconduct. In addition, Mariani contends that his sentence was improperly adjusted upward for obstruction of justice based on his testimony at trial.

We affirm the convictions and sentence.

## FACTS AND PROCEDURAL HISTORY

In 1988 and 1989 Weitzenhoff was the manager and Mariani the assistant manager of the East Honolulu Community Services Sewage Treatment Plant ("the plant"), located not far from Sandy Beach, a popular swimming and surfing beach on Oahu. The plant is designed to treat some 4 million gallons of residential wastewater each day by removing the solids and other harmful pollutants from the sewage so that the resulting effluent can be safely discharged into the ocean. The plant operates under a permit issued pursuant to the National Pollution Discharge Elimination System ("NPDES"), which established the limits on the Total Suspended Solids ("TSS") and Biochemical Oxygen Demand ("BOD")—indicators of the solid and organic matter, respectively, in the effluent discharged at Sandy Beach. During

the period in question, the permit limited the discharge of both the TSS and BOD to an average of 976 pounds per day over a 30–day period. It also imposed monitoring and sampling requirements on the plant's management.

The sewage treatment process that was overseen by Weitzenhoff and Mariani began with the removal of large inorganic items such as rags and coffee grounds from the incoming wastewater as it flowed through metal screens and a grit chamber at the head of the plant. The wastewater then entered large tanks known as primary clarifiers, where a portion of the organic solids settled to the bottom of the tanks. The solid material which settled in the primary clarifiers, known as primary sludge, was pumped to separate tanks, known as anaerobic digesters, to be further processed. Those solids that did not settle continued on to aeration basins, which contained microorganisms to feed on and remove the solids and other organic pollutants in the waste stream.

From the aeration basins the mixture flowed into final clarifiers, where the microorganisms settled out, producing a mixture that sank to the bottom of the clarifiers called activated sludge. The clarified stream then passed through a chlorine contact chamber, where the plant's sampling apparatus was, and emptied into the plant's outfall, a long underground pipe which discharged the plant's effluent into the ocean through diffusers 1,100 to 1,400 feet from shore (the "Sandy Beach outfall").

Meanwhile, the activated sludge that had settled in the final clarifiers was pumped from the bottom of the clarifiers. A certain portion was returned to the aeration basins, while the remainder, known as waste activated sludge ("WAS"), was pumped to WAS holding tanks. From the holding tanks, the WAS could either be returned to other phases of the treatment process or hauled away to a different sewage treatment facility.

From March 1987 through March 1988, the excess WAS generated by the plant was

---

* The Honorable Marilyn L. Huff, United States District Judge for the Southern District of Cali-

fornia, sitting by designation.

hauled away to another treatment plant, the Sand Island Facility. In March 1988, certain improvements were made to the East Honolulu plant and the hauling was discontinued. Within a few weeks, however, the plant began experiencing a buildup of excess WAS. Rather than have the excess WAS hauled away as before, however, Weitzenhoff and Mariani instructed two employees at the plant to dispose of it on a regular basis by pumping it from the storage tanks directly into the outfall, that is, directly into the ocean. The WAS thereby bypassed the plant's effluent sampler so that the samples taken and reported to Hawaii's Department of Health ("DOH") and the EPA did not reflect its discharge.

The evidence produced by the government at trial showed that WAS was discharged directly into the ocean from the plant on about 40 separate occasions from April 1988 to June 1989, resulting in some 436,000 pounds of pollutant solids being discharged into the ocean, and that the discharges violated the plant's 30–day average effluent limit under the permit for most of the months during which they occurred. Most of the WAS discharges occurred during the night, and none was reported to the DOH or EPA. DOH inspectors contacted the plant on several occasions in 1988 in response to complaints by lifeguards at Sandy Beach that sewage was being emitted from the outfall, but Weitzenhoff and Mariani repeatedly denied that there was any problem at the plant. In one letter responding to a DOH inquiry in October 1988, Mariani stated that "the debris that was reported could not have been from the East Honolulu Wastewater Treatment facility, as our records of effluent quality up to this time will substantiate." (U.S. Excerpts of Record ("U.S.E.R.") at 37.) One of the plant employees who participated in the dumping operation testified that Weitzenhoff instructed him not to say anything about the discharges, because if they all stuck together and did not reveal anything, "they [couldn't] do anything to us." (2 R.T. at 66–67.)

Following an FBI investigation, Weitzenhoff and Mariani were charged in a thirty-one-count indictment with conspiracy and substantive violations of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.* At trial, Weitzenhoff and Mariani admitted having authorized the discharges, but claimed that their actions were justified under their interpretation of the NPDES permit. The jury found them guilty of six of the thirty-one counts.[1]

Weitzenhoff was sentenced to twenty-one months and Mariani thirty-three months imprisonment. Each filed a timely notice of appeal.

## DISCUSSION

### A. Intent Requirement

■ Section 1311(a) of the CWA prohibits the discharge of pollutants into navigable waters without an NPDES permit. 33 U.S.C. § 1311(a). Section 1319(c)(2) makes it a felony offense to "knowingly violate[ ] section 1311, 1312, 1316, 1317, 1318, 1321(b)(3), 1328, or 1345 ..., or any permit condition or limitation implementing any of

---

**1.** Weitzenhoff and Mariani were found guilty of count 1, conspiracy to discharge the WAS in violation of the NPDES permit and the Clean Water Act, a violation of 18 U.S.C. § 371; count 9, knowingly discharging WAS in violation of the permit between March and October 1988, a violation of 33 U.S.C. §§ 1311(a) and 1319(c)(2) and 18 U.S.C. § 2; count 10, knowingly rendering inaccurate the plant's monitoring method by discharging WAS beyond the plant's effluent sampler during a period in 1988, a violation of 33 U.S.C. § 1319(c)(4) and 18 U.S.C. § 2; count 22, knowingly making false representations in monthly discharge monitoring reports filed with government regulators by failing to report their discharges of WAS, a violation of 33 U.S.C. § 1319(c)(4) and 18 U.S.C. § 2; count 30, know-

ingly discharging WAS in violation of the permit between January and July 1989, a violation of 33 U.S.C. §§ 1311(a) and 1319(c)(2) and 18 U.S.C. § 2; and count 31, knowingly rendering inaccurate the plant's monitoring method by discharging WAS beyond the plant's effluent sampler during a period in 1989, a violation of 33 U.S.C. § 1319(c)(4) and 18 U.S.C. § 2.

On appeal, most of appellants' energies are directed against the section 1319(c)(2) violations, which are premised on the language of the NPDES permit. Section 1319(c)(4) criminalizes the making of false statements in any document or rendering inaccurate of any monitoring device or method required to be maintained under the CWA.

such sections in a permit issued under section 1342."

Prior to trial, the district court construed "knowingly" in section 1319(c)(2) as requiring only that Weitzenhoff and Mariani were aware that they were discharging the pollutants in question, not that they knew they were violating the terms of the statute or permit. According to appellants, the district court erred in its interpretation of the CWA and in instructing the jury that "the government is not required to prove that the defendant knew that his act or omissions were unlawful," (14 R.T. at 117),[2] as well as in rejecting their proposed instruction based on the defense that they mistakenly believed their conduct was authorized by the permit.[3] Apparently, no court of appeals has confronted the issue raised by appellants.

We review a question of statutory construction de novo. *United States v. Richison*, 901 F.2d 778, 780 (9th Cir.1990). "In construing statutes in a case of first impression, we first look to the language of the controlling statutes, and second to legislative history." *Central Mont. Elec. Power Coop., Inc. v. Administrator of Bonneville Power Admin.*, 840 F.2d 1472, 1477 (9th Cir.1988). Whether a jury instruction misstates elements of a statutory crime is also a question of law reviewed de novo. *United States v. Johnson*, 956 F.2d 197, 199 (9th Cir.1992). If the district court was correct in its interpretation of the statute, then it did not err in giving the instruction it did or refusing to submit appellants' mistake of law defense to the jury.

As with certain other criminal statutes that employ the term "knowingly," it is not apparent from the face of the statute whether "knowingly" means a knowing violation of the law or simply knowing conduct that is violative of the law. We turn, then, to the legisla-

tive history of the provision at issue to ascertain what Congress intended.

In 1987, Congress substantially amended the CWA, elevating the penalties for violations of the Act. *See* H.R.Conf.Rep. No. 1004, 99th Cong., 2d Sess. 138 (1986). Increased penalties were considered necessary to deter would-be polluters. S.Rep. No. 50, 99th Cong., 1st Sess. 29 (1985). With the 1987 amendments, Congress substituted "knowingly" for the earlier intent requirement of "willfully" that appeared in the predecessor to section 1319(c)(2).[4] The Senate report accompanying the legislation explains that the changes in the penalty provisions were to ensure that "[c]riminal liability shall ... attach to any person who is not in compliance with all applicable Federal, State and local requirements and permits *and causes* a POTW [publicly owned treatment works] to violate any effluent limitation or condition in any permit issued to the treatment works." *Id.* (emphasis added). Similarly, the report accompanying the House version of the bill, which contained parallel provisions for enhancement of penalties, states that the proposed amendments were to "provide penalties for dischargers or individuals who knowingly or negligently violate *or cause the violation of* certain of the Act's requirements." H.R.Rep. No. 189, 99th Cong., 1st Sess. 29–30 (1985) (emphasis added). Because they speak in terms of "causing" a violation, the congressional explanations of the new penalty provisions strongly suggest that criminal sanctions are to be imposed on an individual who knowingly engages in conduct that results in a permit violation, regardless of whether the polluter is cognizant of the requirements or even the existence of the permit.

Our conclusion that "knowingly" does not refer to the legal violation is fortified by decisions interpreting analogous public wel-

---

**2.** Appellants do not challenge the court's giving of the same instruction with respect to the section 1319(c)(4) reporting and monitoring violations charged in the indictment.

**3.** This defense is mistakenly labeled "mistake of fact" in Weitzenhoff's brief on appeal.

**4.** At least two courts held that specific intent was not required for conviction under the earlier

version of section 1319, which imposed penalties for "willful or negligent" violations of the CWA without distinction. The current statute imposes harsher penalties for knowing violations than for negligent ones. *United States v. Baytank (Houston) Inc.*, 934 F.2d 599, 618–19 & n. 32 (5th Cir.1991); *United States v. Frezzo Bros., Inc.*, 546 F.Supp. 713, 720–21 (E.D.Pa.1982), *aff'd*, 703 F.2d 62 (3d Cir.), *cert. denied*, 464 U.S. 829, 104 S.Ct. 106, 78 L.Ed.2d 109 (1983).

fare statutes. The leading case in this area is *United States v. International Minerals & Chem. Corp.,* 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971). In *International Minerals,* the Supreme Court construed a statute which made it a crime to "knowingly violate[ ] any ... regulation" promulgated by the ICC pursuant to 18 U.S.C. § 834(a), a provision authorizing the agency to formulate regulations for the safe transport of corrosive liquids. *Id.* at 559, 91 S.Ct. at 1699. The Court held that the term "knowingly" referred to the acts made criminal rather than a violation of the regulation, and that "regulation" was a shorthand designation for the specific acts or omissions contemplated by the act. *Id.* at 560–62, 91 S.Ct. at 1699–1700. "[W]here ... dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *Id.* at 565, 91 S.Ct. at 1701.

This court followed *International Minerals* in *United States v. Hoflin,* 880 F.2d 1033 (9th Cir.1989), *cert. denied,* 493 U.S. 1083, 110 S.Ct. 1143, 107 L.Ed.2d 1047 (1990), when it held that knowledge of the absence of a permit is not an element of the offense defined by 42 U.S.C. § 6928(d)(2)(A), part of the Resource Conservation and Recovery Act ("RCRA"). *Id.* at 1039. "There can be little question that RCRA's purposes, like those of the Food and Drug Act, '... touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection.'" *Id.* at 1038 (quoting *United States v. Dotterweich,* 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943) (construing Food, Drug and Cosmetic Act)); *see also United States v. Sherbondy,* 865 F.2d 996, 1001–03 (9th Cir.1988) (use of word "knowingly" in 18 U.S.C. § 922(g), part of Firearms Owners' Protection Act, does not require proof that defendant knew he was violating law). *But see United States v. Speach,* 968 F.2d 795 (9th Cir.1992) (distinguishing *Hoflin* and holding that different subsection of RCRA uses word "knowingly" in different manner so as to require showing that transporter of hazardous wastes knew that receiving facility lacked storage permit).

Appellants seek to rely on the Supreme Court's decision in *Liparota v. United States,* 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), to support their alternative reading of the intent requirement. *Liparota* concerned 7 U.S.C. § 2024(b)(1), which provides that anyone who "knowingly uses, transfers, acquires, alters, or possesses [food stamp] coupons or authorization cards in any manner not authorized by [the statute] or regulations" is subject to a fine or imprisonment. *Id.* at 420, 105 S.Ct. at 2085. The Court, noting that the conduct at issue did not constitute a public welfare offense, distinguished the *International Minerals* line of cases and held that the government must prove the defendant knew that his acquisition or possession of food stamps was in a manner unauthorized by statute or regulations. *Id.* at 432–33, 105 S.Ct. at 2091–92.

[■] The criminal provisions of the CWA are clearly designed to protect the public at large from the potentially dire consequences of water pollution, *see* S.Rep. No. 99–50, 99th Cong., 1st Sess. 29 (1985), and as such fall within the category of public welfare legislation. *International Minerals* rather than *Liparota* controls the case at hand. The government did not need to prove that Weitzenhoff and Mariani knew that their acts violated the permit or the CWA.

B. Expert Testimony

[■] The essence of Weitzenhoff and Mariani's defense was that their clandestine dumping of thousands of gallons of toxic sludge into the ocean at Sandy Beach was an effort to restore the plant's biological balance so as to avoid a complete plant shutdown and avert environmental disaster. They claim that the discharges of WAS were fully consistent with the NPDES permit. The central issue at trial, therefore, was the meaning of the permit.

In addition to establishing TSS and BOD limits for the effluent discharged at Sandy Beach and imposing monitoring requirements, the permit issued to the East Honolulu plant provided that substances removed from the wastewater could only be disposed of "in a manner such as to prevent any

pollutant from such materials from entering navigable water." (Mariani Excerpts of Record ("M.E.R.") at 68) (NPDES permit).) "Removed substances," according to the permit, include "[s]olids, sludges, filter backwash, or other pollutants removed · in the course of treatment or control of wastewaters." (*Id.*)

The permit also regulates "bypass," defined as "the intentional diversion of waste streams from any portion of a treatment facility." (*Id.* at 66.) Under the permit, bypass is generally prohibited, except to "prevent loss of life, personal injury, or severe property damage" and in the absence of feasible alternatives. (*Id.*) The permit provides, however, that where it will not cause effluent limitations to be exceeded, "[t]he permittee may allow any bypass to occur, but only if it ... is for essential maintenance to assure efficient operation." (*Id.*)

Weitzenhoff and Mariani assert that the discharges were permissible bypasses. They claim that WAS is not a "removed substance," that the discharges they oversaw were for the purpose of "essential maintenance," and that, because they are properly considered "bypasses," the discharges were not required to be reflected in the monitoring reports submitted to government authorities.

The trial judge—concerned that were he to construe the permit, "we [wouldn't] have a case. . . . [w]e would just have a bench trial," (4 R.T. at 168)—treated the interpretation of the permit as a question for the jury. Consistent with this approach, the court permitted witnesses familiar with the wastewater management field to testify about the various technical terms within and obligations imposed by the permit. Since both sides presented witnesses on these issues, the explications of the permit were, as might be expected, contradictory. For example, one government witness testified that a discharge of WAS from a WAS holding tank to an outfall would constitute the disposal of a removed substance in violation of the permit. But he was contradicted by a defense witness who testified that WAS was not a "removed substance" and therefore did not come under the prohibition. While the same government witness defined "essential maintenance" as

pertaining only to the maintenance of the plant's "physical facilities," the defense expert stated that the term could apply to maintenance of the plant's biological process as well as its physical facilities. The court did not resolve these conflicts in its jury charge but instead instructed the jury to "construe" the permit based on "the plain meaning of the language therein" and the testimony of the expert and other witnesses. (14 R.T. at 122.)

Weitzenhoff and Mariani argue that the testimony defining key terms of the permit and explaining its prohibitions amounted to an impermissible delegation of the district judge's duties because, in effect, it was witnesses who instructed the jury on the law rather than the judge. We agree with appellants in this assessment.

The admission of expert testimony is within the discretion of the trial court and reversible only for abuse of discretion or manifest error. *United States v. Arvin*, 900 F.2d 1385, 1388–89 (9th Cir.1990), *cert. denied*, 498 U.S. 1024, 111 S.Ct. 672, 112 L.Ed.2d 664 (1991). Expert testimony is properly admissible when it serves to assist the trier of fact to understand the evidence or determine a fact in issue. *United States v. Brodie*, 858 F.2d 492, 496 (9th Cir.1988). It is well settled, however, that the judge instructs the jury in the law. *Id.* "Resolving doubtful questions of law is the distinct and exclusive province of the trial judge." *Id.* at 497.

Here the district court did not decide the issues of law raised by the parties. Instead of applying the court's interpretation of the law to the facts, then, the jurors applied their own rendition(s) of the law, presumably derived to some degree from the conflicting expert testimony, to the facts. Although the testimony of the witnesses regarding technical terms in the permit might have been permissible had the judge proceeded properly to instruct the jury, *see* Fed.R.Evid. 702 (expert testimony admissible if it will assist the trier of fact), 704 (opinion on ultimate issue to be decided by factfinder not necessarily objectionable), in this case it compounded the error of consigning the interpre-

tation of the law to the jury. The court's admission of expert testimony on contested issues of law in lieu of instructing the jury was manifestly erroneous.[5]

▉ Nonetheless, we hold that the error was harmless because, under a proper interpretation of the permit, the discharges admitted to by Weitzenhoff and Mariani necessarily violated the permit.[6] Since construction of the permit is a matter of law, we are in a position to interpret the permit provisions at issue. *Hemlani v. Guerrero*, 902 F.2d 1412, 1415 (9th Cir.1990) ("The interpretation of this statute is purely a question of law, the issue has been fully briefed, and we are in as good a position as the [district] court to decide if the statute means what it says."). We note that in deciding what the provisions mean, we need not choose between the conflicting expert opinions; the critical terms are either defined in the permit itself or their meaning is apparent from EPA's commentary on its permitting guidelines. As we are able to accomplish the task of permit interpretation without turning to the experts, we are not hampered by questions of witness credibility, which of course could not be resolved by us on appeal. *United States v. Gordon*, 844 F.2d 1397, 1405 (9th Cir.1988) ("Questions of credibility are for the jury to decide and are generally immune from appellate review.")

▉ We begin by observing that, notwithstanding the "expert" testimony to the contrary, the excess WAS that was separated out from the plant's treatment process to be stored and eventually disposed of clearly falls within the permit's definition of a "removed substance" because it was a "sludge[ ] . . .

removed in the course of treatment or control of wastewaters." (M.E.R. at 68.) As such, it could not be discharged into the ocean unless the discharge constituted a permissible bypass of the treatment system.

▉ Even assuming that the oceanic dumping of WAS at Sandy Beach did not violate the East Honolulu facility's effluent standards,[7] a doubtful proposition, we hold that the discharges were not permissible bypasses because they were not for "essential maintenance to assure efficient operation." (*Id.* at 66.) An NPDES permit must conform to EPA regulations. *See* 40 C.F.R. § 122.1 *et seq.* (permitting requirements). In establishing the guideline prohibiting bypass except where necessary for essential maintenance, 40 C.F.R. § 122.41(m), the EPA explained that "[g]enerally, maintenance is that which is necessary to maintain the performance, removal efficiency and effluent quality of the *pollution control equipment.* However, for the purposes of this section, it is necessary to distinguish between maintenance that is 'essential' and that which is routine." 49 Fed.Reg. 38,037 (1984) (emphasis added). The discussion in the Federal Register focuses on necessary repairs and upkeep of plant equipment and emphasizes that if it is feasible to perform the maintenance "with no loss in treatment plant performance," the maintenance is not considered "essential" for the purposes of the bypass exception. *Id.* There is no indication that the EPA considered anything other than unavoidable measures to ensure the continuing operation of plant equipment to be "essential maintenance."

---

5. We note that the defense contributed to this error by insisting that the court not define any of the permit's terms for the jury in its charge, but merely instruct the jury to "follow the *plain meaning* of the language" in the permit. (U.S.E.R. at 74.) The defendants, however, had initially objected to the admission of any expert testimony concerning permit terms. After the court ruled such testimony admissible, defendants presented their own expert testimony to counter that of the government witnesses. Under these circumstances, we decline to hold that appellants invited the error.

6. The government presented evidence and arguments indicating that the permit was violated in more than one way. There was no special verdict in the case, however, and consequently, there is no means for us to ascertain which theory or theories the jury adopted. Even though the government presented compelling evidence that the discharges caused the plant's effluent limitations to be exceeded, we assume for the purposes of this analysis that the jury rejected this evidence, as it was entitled to, and rely only on appellants' admissions to support our conclusion that the permit was violated.

7. *See supra* note.6.

■ The EPA's interpretation of its bypass regulation is entitled to considerable weight. *Force v. Director, Office of Workers' Compensation Programs,* 938 F.2d 981, 983 (9th Cir.1991); *Natural Resources Defense Council, Inc. v. U.S. Environmental Protection Agency,* 822 F.2d 104, 122 (D.C.Cir.1987) (upholding bypass provision). We therefore reject appellants' interpretation of the bypass exception as authorizing their wholesale dumping of WAS into the ocean and circumvention of the plant's monitoring apparatus. The discharges they directed were not for the purpose of maintaining plant equipment. Nor were they essential, for the record establishes that a ready alternative existed: Weitzenhoff and Mariani could have had the excess WAS hauled away.

Finally, we note that appellants' attempt to construe the permit as allowing these discharges turns the entire statutory scheme on its head. In keeping with the goal of the CWA, the EPA's bypass rule was devised to ensure "that the applicable treatment technology, implemented for the purpose of achieving pollution reduction equivalent to the 'best technology,' be operated as designed." *Natural Resources Defense Council,* 822 F.2d at 124. To endorse appellants' interpretation would be to grant permit holders carte blanche to pollute whenever the slightest managerial inconvenience presented itself. We are certain that this is not what Congress intended.

## C. Vagueness

■ Weitzenhoff and Mariani contend that, especially in the absence of a requirement that they knew they were violating the law, the NPDES permit is unconstitutionally vague. They assert that key provisions of the permit, in particular those that were debated at trial, have no established meaning. The district court declined to rule on defendants' vagueness claim at a pretrial hearing but denied a motion for acquittal based on the ambiguity of the permit after the close of the government's case.

■ Whether the permit was unconstitutionally vague is a question of law which we review de novo. *United States v. Christopher,* 700 F.2d 1253, 1258 (9th Cir.), *cert.*

*denied,* 461 U.S. 960, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983). "A defendant is deemed to have fair notice of an offense if a reasonable person of ordinary intelligence would understand that his or her conduct is prohibited by the law in question." *United States v. Fitzgerald,* 882 F.2d 397, 398 (9th Cir.1989). In evaluating a question of vagueness, we ordinarily look to the common understanding of the terms of a statute. *Id.* However, if the statutory prohibition "involves conduct of a select group of persons having specialized knowledge, and the challenged phraseology is indigenous to the idiom of that class, the standard is lowered and a court may uphold a statute which 'uses words or phrases having a technical or other special meaning, well enough known to enable those within its reach to correctly apply them.' " *Precious Metals Assocs., Inc. v. Commodity Futures Trading Commission,* 620 F.2d 900, 907 (1st Cir.1980) (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)).

Pursuant to the preceding analysis of the permit's terms, which, as we have demonstrated, have meaning in the context of the EPA regulatory scheme, we have no trouble in upholding the permit against appellants' vagueness challenge. Weitzenhoff and Mariani were knowledgeable in the wastewater field and can be expected to have understood what the permit meant. In particular, they should have known that it did not give them license to dump thousands of gallons of partially treated sewage into the ocean on a regular basis.

We are further persuaded that appellants had adequate notice of the illegality of their dumping by the considerable pains they took to conceal their activities. The discharges were effected mainly at night; plant personnel were not to discuss them; and Weitzenhoff and Mariani consistently repeatedly denied the illicit operation when questioned by health authorities. These are not the ways of conscientious managers seeking to safeguard the environment.

Although we affirm the convictions on the basis of Weitzenhoff and Mariani's factual admissions and our interpretation of the per-

mit rather than attempting to divine the facts upon which the jury based its verdict, we nonetheless address the additional concerns raised by appellants relating to the presentation of the case to the jury. We do this because had the court erroneously deprived the jury of an opportunity to acquit or wrongly refused to grant a mistrial, we might not be in a position to affirm. That is, had the jury acquitted or a mistrial been declared, there would be no convictions to uphold.

### D. Exclusion of Evidence

██ At trial, defendants sought to introduce an excerpt from the Federal Register describing a regulation proposed in 1984 by the EPA but never adopted. As explained in 49 Federal Register 38,036 (1984), the regulation would have permitted bypass of effluent from a wastewater treatment facility

where the resultant effluent is in compliance with permit limitations. The proposal would allow any bypass which does not cause a violation of permit limitations or other permit conditions. However, to ensure that permit limitations are, in fact, not exceeded during the bypass, the proposed amendment would require permittees to monitor all affected discharge points at the time of any bypass.

(Weitzenhoff Excerpts of Record at 74.) Weitzenhoff and Mariani claim this should have been admitted as evidence because, combined with the fact that it was never adopted, it suggests that the EPA did not require them to monitor the discharges they characterize as bypasses. The district court held the excerpt inadmissible since the regulation was never adopted, the language cited by the defense was of dubious significance, and such "evidence" would confuse the jury.

We review the exclusion of the evidence for abuse of discretion. *United States v. Kessi,* 868 F.2d 1097, 1107 (9th Cir.1989); *United States v. Soulard,* 730 F.2d 1292, 1296 (9th Cir.1984). Although the explanation of the proposed regulation might properly have been considered (or disregarded) by the court in ruling on the legal issues in the case, it was not relevant to the jury's determination of the facts. Thus, notwithstanding

the fact that the jury was impermissibly assigned the task of interpreting the permit, the district court did not abuse its discretion in excluding the Federal Register excerpt from the jury's consideration.

### E. Entrapment by Estoppel Defense

██ The district court ruled after the close of evidence that it would not give Weitzenhoff and Mariani's proposed jury instruction on the elements of an entrapment by estoppel defense because the defense was not warranted by the law or the facts of the case. Appellants claim the court's refusal to give the instruction warrants reversal.

"A defendant is entitled to an instruction covering a theory of defense if it has a basis in law and there is some foundation for it in the evidence." *United States v. Ibarra-Alcarez,* 830 F.2d 968, 973 (9th Cir.1987). A trial court's determination that the evidence was insufficient to justify the giving of an instruction on a theory of defense is a question of law which we review de novo. *Id.*

██ Entrapment by estoppel applies when an authorized government official tells the defendant that certain conduct is legal and the defendant believes the official. *United States v. Brebner,* 951 F.2d 1017, 1024 (9th Cir.1991). To invoke the entrapment by estoppel defense, the defendant must show that he relied on the official's statement and that his reliance was reasonable in that a person sincerely desirous of obeying the law would have accepted the information as true and would not have been put on notice to make further inquiries. *United States v. Lansing,* 424 F.2d 225, 227 (9th Cir.1970).

Weitzenhoff and Mariani contend that the jury should have been permitted to consider whether they were entrapped by the government, for two reasons: because they were entitled to rely upon the "plain language" of the permit as a "comprehensive official statement of the law"—at the same time, of course, claiming that they abided by the permit; and because of the fact that regulatory authorities had previously permitted them to haul excess WAS to the Sand Island waste treatment facility where it only underwent a

primary treatment process before being discharged into the ocean. According to Weitzenhoff and Mariani, the authorization to haul the WAS to the another facility that lacked a secondary treatment process somehow implies that it was acceptable to discharge the WAS from the East Honolulu plant without additional treatment.

The first of appellants' theories is flawed because it merely begs the critical inquiry in this case, that is, the correct interpretation of the permit. It would have been entirely superfluous to have the jury decide whether appellants properly relied on the permit since no one disputes that they were bound by it.

The second asserted rationale is a tortured one that does not make out a claim of entrapment by estoppel. Even if disposing of the WAS by hauling it to the Sand Island facility could somehow plausibly be equated with dumping it into the Sandy Beach outfall, appellants do not point to a statement on the part of a government official upon which they relied in reaching this conclusion. Moreover, the fact that it was lawful to discharge WAS at Sand Island without secondary treatment has no bearing on the discharge limitations at the East Honolulu plant, which operated under its own permit.[8] If Weitzenhoff and Mariani had had a genuine desire to obey the law, they would have sought advice from the appropriate authorities as to how properly to dispose of the excess WAS.

## F. Prosecutorial Misconduct

 Weitzenhoff and Mariani object to what they characterize as the prosecutor's deliberate attempts to elicit irrelevant and inflammatory testimony regarding the potential health effects of the WAS discharges despite the trial court's ruling limiting such testimony. "A claim of prosecutorial misconduct must be viewed in the entire context of the trial." *United States v. Christophe*, 833 F.2d 1296, 1300 (9th Cir.1987). Reversal is justified only if the alleged misconduct materially affected the verdict or deprived the defendant of a fair trial. *Id.* at 1301; *see*

*also United States v. Simtob*, 901 F.2d 799, 806 (9th Cir.1990) ("[P]rosecutorial misconduct invites reversal if it appears more probable than not that the alleged misconduct affected the jury's verdict."). Depending upon the circumstances, a prompt and effective admonishment of counsel or curative instruction from the trial judge may effectively "neutralize the damage." *Simtob*, 901 F.2d at 806.

During the first part of the trial, the government introduced evidence about the health concerns associated with sewage through three witnesses who testified about the waste treatment process and its goal of ridding wastewater of disease-causing microorganisms to the extent possible. One of these witnesses, Ken Greenberg, noted that the discharge from a treatment facility could have adverse effects on the receiving waters and harm swimmers. Defendants failed to object to any of this testimony.

Later on in the trial, however, when the government asked a question of another witness concerning the length of the outfall at Sandy Beach, defendants objected on relevance grounds. The government argued that the testimony was relevant to show defendants' motive in concealing their activities. The court, while expressing initial concern about the lack of relevance and prejudicial effects of injecting "gruesome" testimony about "viruses floating in the water," ruled that testimony regarding the potential health risks of discharging WAS into the water could come in, so long as the prosecutor stayed away from detailed accounts of "viruses and AIDS and all other kinds of stuff." (8 R.T. at 36.)

Edmund Pestana, a lifeguard at Sandy Beach, subsequently testified for the government about the plumes of brown water he had observed coming out of the outfall. The prosecutor asked whether Pestana was aware of people getting sick at the beach, to which the lifeguard answered "yes." The court sustained defendants' objection and instructed the jury to disregard the response. La-

---

8. The government points out that the outfall for the Sand Island facility is many times longer than the one at Sandy Beach, which accounts for the stricter waste handling requirements imposed on the East Honolulu plant.

ter, Pestana was asked what he noticed during an incident in which he had windsurfed through discolored water. Pestana stated that he knew he was going through sewage water: "It smelled of it, and it looked of it, and it's nothing less than what your imagination can conjure up. I was scared to fall off my board and into it and get my face wet or anything like that in my mouth or my ears or my nose." (8 R.T. at 126.) The judge ordered the quoted testimony stricken and instructed the jury to disregard it.

At the conclusion of Pestana's testimony, defendants moved for a mistrial, alleging that the prosecutor had deliberately violated the court's ruling regarding the limitations on such testimony. The court denied the motion, noting its curative instructions and the fact that it was common knowledge that WAS, if ingested, would pose a health risk.

Appellants also point to the prosecutor's cross-examination of their wastewater expert regarding the length of the Sandy Beach versus the Sand Island outfall. In the course of this exchange, the court sustained the defendants' objections to two questions regarding whether there were many swimmers near these outfalls.

Finally, in his closing argument, the prosecutor drew attention to the public health hazard engendered by defendants' activities, stating that Weitzenhoff and Mariani "placed at risk the hundreds of people, surfers, body boarders, swimmers, divers, fishermen, people who use Sandy Beach every day." (14 R.T. at 9–10.) The court did not respond to these remarks as defendants did not object to them.

Although the challenged testimony and prosecutorial remarks were of questionable relevance and indeed conveyed repugnant images, considered in the context of the entire proceeding, we do not believe they could have materially affected the verdict or rendered the trial unfair. A substantial amount of testimony regarding the health risks associated with WAS—indeed, the most specific references to viruses, bacteria, and so forth—came in without objection prior to the testimony appellants claim was so prejudicial.

As for the most exceptionable testimony, that of the lifeguard, the court sustained objections and issued prompt curative instructions.

■ Most significant to our analysis, though, is that throughout the trial, Weitzenhoff and Mariani attempted to portray their discharging of WAS into the ocean as a responsible tactic to forestall environmental disaster, thus putting the safety of the public at issue. Both defendants made this point in their opening statements. Later on, Mariani testified that in ordering the discharges, the public health was "first and foremost" in his mind. (11 R.T. at 23, 25.) Against this backdrop, the prosecutor's few additional questions touching upon the health issue and the comments in his summation cannot be considered misconduct.

G. Upward Adjustment of Mariani's Sentence

■ Mariani contends that the court's two-point upward adjustment of his offense level pursuant to U.S.S.G. § 3C1.1 for obstruction of justice based on the court's finding that he perjured himself was not warranted by his conduct at trial and represents an unconstitutional interference with his right to testify.[9] We review the court's interpretation of the sentencing guidelines de novo, and the factual findings underlying the upward adjustment for clear error. *United States v. McAninch*, 994 F.2d 1380, 1384 (9th Cir.1993).

In sentencing Mariani, the court expressly adopted the determination of the presentence report that Mariani had lied in his testimony at trial. The presentence report notes, with support in the record, that Mariani perjured himself on several occasions when he stated that he believed that the discharges of WAS did not violate the permit. The record shows, for example, that at trial, Mariani consciously underrepresented the size of a WAS holding tank, thus underrepresenting the potential size and impact of the discharges from it. His testimony that he believed that his activities were within the scope of the permit is belied by his efforts to conceal

---

9. Weitzenhoff elected not to testify at trial.

them. The district court's findings in support of the upward adjustment were not clearly erroneous.

■ Mariani's constitutional challenge to the obstruction of justice enhancement is unavailing. The Supreme Court recently rejected the contention, as had this court, that a sentencing increase based on false testimony unconstitutionally burdens a defendant's right to testify. *United States v. Dunnigan*, — U.S. —, —, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993); *see also United States v. Torres–Rodriguez*, 930 F.2d 1375, 1389–90 (9th Cir.1991); *United States v. Barbosa*, 906 F.2d 1366, 1369–40 (9th Cir.), *cert. denied*, 498 U.S. 961, 111 S.Ct. 394, 112 L.Ed.2d 403 (1990). "[A] defendant's right to testify does not include a right to commit perjury." *Dunnigan*, — U.S. at —, 113 S.Ct. at 1117. Mariani's sentence was justly enhanced.

We **AFFIRM** both the convictions and Mariani's sentence.