**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Michael H. WEITZENHOFF; Thomas W. Mariani, Defendants–Appellants.**

**Nos. 92–10105, 92–10108.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 11, 1993.

Decided Aug. 3, 1993.

As Amended on Denial of Rehearing and Rehearing En Banc Aug. 8, 1994.

also remand this as applied issue to the district court.

[redacted]

Craig H. Nakamura, Asst. U.S. Atty., Honolulu, Hawai'i, for plaintiff-appellee.

Philip H. Lowenthal, Lowenthal, August and Graham, Wailuku, Hawai'i, for defendant-appellant Weitzenhoff.

Peter C. Wolff, Jr., Honolulu, Hawai'i, for defendant-appellant Mariani.

[redacted]

Before: GOODWIN and FLETCHER, Circuit Judges and HUFF,* District Judge.

ORDER AMENDING OPINION AND DENYING PETITION FOR REHEARING AND REHEARING EN BANC

Aug. 8, 1994.

The opinion filed at 1 F.3d 1523 is amended as follows:

At 1 F.3d 1530, bottom of the first column, delete:

*But see United States v. Speach,* 968 F.2d 795 (9th Cir.1992) (distinguishing *Hoflin* and holding that different subsection of RCRA uses word "knowingly" in different manner so as to require showing that transporter of hazardous wastes knew that receiving facility lacked storage permit).

Add footnote "5" following "violating law)." in the line prior to the deleted text:

5 Weitzenhoff argues that this case is controlled by *United States v. Speach,* 968 F.2d 795, 796–97 (9th Cir.1992), in which we held that 42 U.S.C. § 6928(d)(1), which imposes criminal liability on parties who "knowingly transport[ ] ... hazardous waste ... to a facility which does not have a permit," requires that the transporter know that he acted in violation of the statute. This argument is unavailing because *Speach* recognizes the general rule that public welfare offenses are not to be construed to require proof that the defendant knew he was violating the law in the absence of clear evidence of contrary congressional intent and finds only a narrow exception to this general rule. In *Speach,* we relied on the fact that the defendant was not the permittee but simply the individual who transported waste to the permittee, and, as contrasted to the permittee was not "the person in the best position to know the facility's permit status." *Id.* at 797. Although we considered it unreasonable to put the defendant at risk for failing to ascertain the permit status of the receiving facility, we recognized that such a risk is not unreasonable when the permittee is also the defendant. *Id.* In this case, as the permittees, appellants are clearly in the best position to know their own permit status, and are among those persons upon whom the *Speach* court would impose liability.

Replace the deleted language of text with:

Other courts have also followed *International Minerals* by similarly construing the knowledge requirement in statutes that regulate deleterious devices or obnoxious waste materials. *E.g., United States v. Laughlin,* 10 F.3d 961, 965–66 (2d Cir. 1993) (§ 6928(d)(2)(A) of RCRA), *cert. denied,* — U.S. —, 114 S.Ct. 1649, 128 L.Ed.2d 368 (1994); *United States v. Buckley,* 934 F.2d 84, 88 (6th Cir.1991) (pre–1990 version of § 7413(c)(1)(C) of the Clean Air Act); *United States v. Dee,* 912 F.2d 741, 745 (4th Cir.1990), *cert. denied,* 499 U.S. 919, 111 S.Ct. 1307, 113 L.Ed.2d 242 (1991) (§ 6928(d)(2)(A) of RCRA); *United States v. Corbin Farm Serv.,* 444 F.Supp. 510, 519–20 (E.D.Cal.), *aff'd,* 578 F.2d 259 (9th Cir.1978) (Federal Insecticide, Fungicide and Rodenticide Act).[6]

6 Like the court in *International Minerals,* we construe the language in § 1319(c)(2)(A) prohibiting knowing violation of "any permit condition" as a "shorthand designation for specific acts" that violate the CWA. *See International Minerals,* 402 U.S. at 567, 91 S.Ct. at 1703. In both § 1319(c)(2)(A) and the statute in question in *International Minerals,* the penalty provisions were drafted in a general fashion to encompass a wide variety of possible violations of the Acts and the word "knowingly" is used to reflect a re-

* Honorable Marilyn L. Huff, United States District Judge for the Southern District of California, sitting by designation.

quirement that the government prove general intent in order to establish a violation. *See also Buckley,* 934 F.2d at 88 ("knowingly ... violates section 7411(e) ..."); *Sherbondy,* 865 F.2d at 1002 ("knowingly violates subsection ... (g) ... of section 922"); *Corbin Farm Serv.,* 444 F.Supp. at 518 ("knowingly violates any provision of this subchapter").

At 1 F.3d 1530, second column, immediately following first paragraph, insert:

Subsequent to the filing of the original opinion in this case, the Supreme Court decided two cases which Weitzenhoff contends call our analysis into question. *See Ratzlaf v. United States,* —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994); *Staples v. United States,* —— U.S. ——, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). We disagree.

The statute in *Ratzlaf* does not deal with a public welfare offense, but rather with violations of the banking statutes. The Court construed the term "willfully" in the anti-structuring provisions of the Bank Secrecy Act to require both that the defendant knew he was structuring transactions to avoid reporting requirements and that he knew his acts were unlawful. The Court recognized that the money structuring provisions are not directed at conduct which a reasonable person necessarily should know is subject to strict public regulation and that the structuring offense applied to all persons with more than $10,000, many of whom could be engaged in structuring for innocent reasons. *Ratzlaf,* —— U.S. at ——–——, 114 S.Ct. at 660–62. In contrast, parties such as Weitzenhoff are closely regulated and are discharging waste materials that affect public health. The *International Minerals* rationale requires that we impute to these parties knowledge of their operating permit. This was recognized by the Court in *Staples.*

The specific holding in *Staples* was that the government is required to prove that a defendant charged with possession of a machine gun knew that the weapon he possessed had the characteristics that brought it within the statutory definition of a machinegun. But the Court took pains to contrast the gun laws to other regulatory regimes, specifically those regulations that govern the handling of "obnoxious waste materials." *See Staples,* —— U.S. at ——, 114 S.Ct. at 1798. It noted that the mere innocent ownership of guns is not a public welfare offense. *Id.* at ——, 114 S.Ct. at 1804. The Court focussed on the long tradition of widespread gun ownership in this country and, recognizing that approximately 50% of American homes contain a firearm, *id.* at ——, 114 S.Ct. at 1801, acknowledged that mere ownership of a gun is not sufficient to place people on notice that the act of owning an unregistered firearm is not innocent under the law.

*Staples* thus explicitly contrasted the mere possession of guns to public welfare offenses, which include statutes that regulate " 'dangerous or deleterious devices or products or obnoxious waste materials,' " *id.* at ——, 114 S.Ct. at 1800, and confirmed the continued vitality of statutes covering public welfare offenses, which "regulate potentially harmful or injurious items" and place a defendant on notice that he is dealing with a device or a substance "that places him in 'responsible relation to a public danger.' " *Id.* "[I]n such cases Congress intended to place the burden on the defendant to ascertain at his peril whether [his conduct] comes within the inhibition of the statute." *Id.* at ——, 114 S.Ct. at 1798 (citations and internal quotations omitted).

Unlike "[g]uns [which] in general are not 'deleterious devices or products or obnoxious waste materials,' *International Minerals, supra* [402 U.S.], at 565 [91 S.Ct. at 1702], that put their owners on notice that they stand 'in responsible relation to a public danger[,]' *Dotterweich,* 320 U.S. at 281 [64 S.Ct. at 136]," *Staples,* —— U.S. at ——, 114 S.Ct. at 1800, the dumping of sewage and other pollutants into our nation's waters is precisely the type of activity that puts the discharger on notice that his acts may pose a public danger. Like other public welfare offenses that regulate the discharge of pollutants into the air, the disposal of hazardous wastes, the undocumented shipping of acids, and the use of pesticides on our food, the improper and excessive discharge of sewage causes chol-

era, hepatitis, and other serious illnesses, and can have serious repercussions for public health and welfare.[7]

7 In *Staples,* the Court also noted that the penalty attached to a violation of a criminal statute in the past has been a relevant factor in determining whether the statute defines a public welfare offense. The Court recognized that public welfare offenses originally involved statutes that provided only light penalties such as fines or short jail sentences, *see* — U.S. at ——, 114 S.Ct. at 1802, but that modern statutes now punish public welfare offenses with much more significant terms of imprisonment. *E.g., International Minerals,* 402 U.S. 558, 91 S.Ct. 1697 (ten years imprisonment if death or bodily injury results from violation); *United States v. Freed,* 401 U.S. 601, 609–10, 91 S.Ct. 1112, 1118–19, 28 L.Ed.2d 356 (1971) (five years imprisonment for possession of unregistered grenade); *Hoflin,* 880 F.2d 1033 (two years imprisonment for certain violations of RCRA). While the *Staples* opinion expresses concern with this evolution of enhanced punishments for public welfare offenses, it refrains from holding that public welfare offenses may not be punished as felonies. *Staples,* — U.S. at ——, 114 S.Ct. at 1804 (stating that the early cases suggest that public welfare offenses might not extend to felonies, but noting that "[w]e need not adopt such a definitive rule of construction to decide this case").

Except for the above amendments, the petition for rehearing is denied and the petition for rehearing en banc is rejected.

The petition for rehearing en banc was circulated to the full court. An active judge of this court requested a vote as to whether the case should be reheard en banc. Less than the required majority of the non-recused active judges voted to take the case en banc.

No further petitions for rehearing or rehearing en banc will be entertained. The mandate shall issue forthwith.

## OPINION

FLETCHER, Circuit Judge:

Michael H. Weitzenhoff and Thomas W. Mariani, who managed the East Honolulu Community Services Sewage Treatment Plant, appeal their convictions for violations of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 et seq., contending that 1) the district court misconstrued the word "knowingly" under section 1319(c)(2) of the CWA; 2) the court improperly permitted witnesses to testify as to the meaning of the terms and provisions of the permit issued to the East Honolulu plant; 3) the court erred in concluding that the permit was not unconstitutionally vague; 4) evidence they sought to introduce concerning a regulation proposed by the EPA was improperly excluded; 5) the court erred in refusing their proposed instruction on entrapment by estoppel; and 6) the court should have granted a mistrial due to prosecutorial misconduct. In addition, Mariani contends that his sentence was improperly adjusted upward for obstruction of justice based on his testimony at trial.

We affirm the convictions and sentence.

## FACTS AND PROCEDURAL HISTORY

In 1988 and 1989 Weitzenhoff was the manager and Mariani the assistant manager of the East Honolulu Community Services Sewage Treatment Plant ("the plant"), located not far from Sandy Beach, a popular swimming and surfing beach on Oahu. The plant is designed to treat some 4 million gallons of residential wastewater each day by removing the solids and other harmful pollutants from the sewage so that the resulting effluent can be safely discharged into the ocean. The plant operates under a permit issued pursuant to the National Pollution Discharge Elimination System ("NPDES"), which established the limits on the Total Suspended Solids ("TSS") and Biochemical Oxygen Demand ("BOD")—indicators of the solid and organic matter, respectively, in the effluent discharged at Sandy Beach. During the period in question, the permit limited the discharge of both the TSS and BOD to an average of 976 pounds per day over a 30–day period. It also imposed monitoring and sampling requirements on the plant's management.

The sewage treatment process that was overseen by Weitzenhoff and Mariani began

**1282**

with the removal of large inorganic items such as rags and coffee grounds from the incoming wastewater as it flowed through metal screens and a grit chamber at the head of the plant. The wastewater then entered large tanks known as primary clarifiers, where a portion of the organic solids settled to the bottom of the tanks. The solid material which settled in the primary clarifiers, known as primary sludge, was pumped to separate tanks, known as anaerobic digesters, to be further processed. Those solids that did not settle continued on to aeration basins, which contained microorganisms to feed on and remove the solids and other organic pollutants in the waste stream.

From the aeration basins the mixture flowed into final clarifiers, where the microorganisms settled out, producing a mixture that sank to the bottom of the clarifiers called activated sludge. The clarified stream then passed through a chlorine contact chamber, where the plant's sampling apparatus was, and emptied into the plant's outfall, a long underground pipe which discharged the plant's effluent into the ocean through diffusers 1,100 to 1,400 feet from shore (the "Sandy Beach outfall").

Meanwhile, the activated sludge that had settled in the final clarifiers was pumped from the bottom of the clarifiers. A certain portion was returned to the aeration basins, while the remainder, known as waste activated sludge ("WAS"), was pumped to WAS holding tanks. From the holding tanks, the WAS could either be returned to other phases of the treatment process or hauled away to a different sewage treatment facility.

From March 1987 through March 1988, the excess WAS generated by the plant was hauled away to another treatment plant, the Sand Island Facility. In March 1988, certain improvements were made to the East Honolulu plant and the hauling was discontinued. Within a few weeks, however, the plant began experiencing a buildup of excess WAS. Rather than have the excess WAS hauled away as before, however, Weitzenhoff and Mariani instructed two employees at the plant to dispose of it on a regular basis by pumping it from the storage tanks directly into the outfall, that is, directly into the ocean. The WAS thereby bypassed the plant's effluent sampler so that the samples taken and reported to Hawaii's Department of Health ("DOH") and the EPA did not reflect its discharge.

The evidence produced by the government at trial showed that WAS was discharged directly into the ocean from the plant on about 40 separate occasions from April 1988 to June 1989, resulting in some 436,000 pounds of pollutant solids being discharged into the ocean, and that the discharges violated the plant's 30–day average effluent limit under the permit for most of the months during which they occurred. Most of the WAS discharges occurred during the night, and none was reported to the DOH or EPA. DOH inspectors contacted the plant on several occasions in 1988 in response to complaints by lifeguards at Sandy Beach that sewage was being emitted from the outfall, but Weitzenhoff and Mariani repeatedly denied that there was any problem at the plant. In one letter responding to a DOH inquiry in October 1988, Mariani stated that "the debris that was reported could not have been from the East Honolulu Wastewater Treatment facility, as our records of effluent quality up to this time will substantiate." (U.S. Excerpts of Record ("U.S.E.R.") at 37.) One of the plant employees who participated in the dumping operation testified that Weitzenhoff instructed him not to say anything about the discharges, because if they all stuck together and did not reveal anything, "they [couldn't] do anything to us." (2 R.T. at 66–67.)

Following an FBI investigation, Weitzenhoff and Mariani were charged in a thirty-one-count indictment with conspiracy and substantive violations of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 et seq. At trial, Weitzenhoff and Mariani admitted having authorized the discharges, but claimed that their actions were justified under their interpretation of the NPDES permit. The jury found them guilty of six of the thirty-one counts.[1]

Weitzenhoff was sentenced to twenty-one months and Mariani thirty-three months im-

1. Weitzenhoff and Mariani were found guilty of count 1, conspiracy to discharge the WAS in violation of the NPDES permit and the Clean Water Act, a violation of 18 U.S.C. § 371; count 9, knowingly discharging WAS in violation of the

prisonment. Each filed a timely notice of appeal.

## DISCUSSION

### A. Intent Requirement

■ Section 1311(a) of the CWA prohibits the discharge of pollutants into navigable waters without an NPDES permit. 33 U.S.C. § 1311(a). Section 1319(c)(2) makes it a felony offense to "knowingly violate[ ] section 1311, 1312, 1316, 1317, 1318, 1321(b)(3), 1328, or 1345 . . ., or any permit condition or limitation implementing any of such sections in a permit issued under section 1342."

Prior to trial, the district court construed "knowingly" in section 1319(c)(2) as requiring only that Weitzenhoff and Mariani were aware that they were discharging the pollutants in question, not that they knew they were violating the terms of the statute or permit. According to appellants, the district court erred in its interpretation of the CWA and in instructing the jury that "the government is not required to prove that the defendant knew that his act or omissions were unlawful," (14 R.T. at 117),[2] as well as in rejecting their proposed instruction based on the defense that they mistakenly believed their conduct was authorized by the permit.[3] Apparently, no court of appeals has confronted the issue raised by appellants.

We review a question of statutory construction de novo. *United States v. Richi-son*, 901 F.2d 778, 780 (9th Cir.1990). "In construing statutes in a case of first impression, we first look to the language of the controlling statutes, and second to legislative history." *Central Mont. Elec. Power Coop., Inc. v. Administrator of Bonneville Power Admin.*, 840 F.2d 1472, 1477 (9th Cir.1988). Whether a jury instruction misstates elements of a statutory crime is also a question of law reviewed de novo. *United States v. Johnson*, 956 F.2d 197, 199 (9th Cir.1992). If the district court was correct in its interpretation of the statute, then it did not err in giving the instruction it did or refusing to submit appellants' mistake of law defense to the jury.

As with certain other criminal statutes that employ the term "knowingly," it is not apparent from the face of the statute whether "knowingly" means a knowing violation of the law or simply knowing conduct that is violative of the law. We turn, then, to the legislative history of the provision at issue to ascertain what Congress intended.

In 1987, Congress substantially amended the CWA, elevating the penalties for violations of the Act. *See* H.R.Conf.Rep. No. 1004, 99th Cong., 2d Sess. 138 (1986). Increased penalties were considered necessary to deter would-be polluters. S.Rep. No. 50, 99th Cong., 1st Sess. 29 (1985). With the 1987 amendments, Congress substituted "knowingly" for the earlier intent requirement of "willfully" that appeared in the predecessor to section 1319(c)(2).[4] The Senate

---

permit between March and October 1988, a violation of 33 U.S.C. §§ 1311(a) and 1319(c)(2) and 18 U.S.C. § 2; count 10, knowingly rendering inaccurate the plant's monitoring method by discharging WAS beyond the plant's effluent sampler during a period in 1988, a violation of 33 U.S.C. § 1319(c)(4) and 18 U.S.C. § 2; count 22, knowingly making false representations in monthly discharge monitoring reports filed with government regulators by failing to report their discharges of WAS, a violation of 33 U.S.C. § 1319(c)(4) and 18 U.S.C. § 2; count 30, knowingly discharging WAS in violation of the permit between January and July 1989, a violation of 33 U.S.C. §§ 1311(a) and 1319(c)(2) and 18 U.S.C. § 2; and count 31, knowingly rendering inaccurate the plant's monitoring method by discharging WAS beyond the plant's effluent sampler during a period in 1989, a violation of 33 U.S.C. § 1319(c)(4) and 18 U.S.C. § 2.

On appeal, most of appellants' energies are directed against the section 1319(c)(2) violations,

which are premised on the language of the NPDES permit. Section 1319(c)(4) criminalizes the making of false statements in any document or rendering inaccurate of any monitoring device or method required to be maintained under the CWA.

2. Appellants do not challenge the court's giving of the same instruction with respect to the section 1319(c)(4) reporting and monitoring violations charged in the indictment.

3. This defense is mistakenly labeled "mistake of fact" in Weitzenhoff's brief on appeal.

4. At least two courts held that specific intent was not required for conviction under the earlier version of section 1319, which imposed penalties for "willful or negligent" violations of the CWA without distinction. The current statute imposes harsher penalties for knowing violations than for negligent ones. *United States v. Baytank (Houston), Inc.*, 934 F.2d 599, 618–19 & n. 32 (5th

report accompanying the legislation explains that the changes in the penalty provisions were to ensure that "[c]riminal liability shall ... attach to any person who is not in compliance with all applicable Federal, State and local requirements and permits *and causes* a POTW [publicly owned treatment works] to violate any effluent limitation or condition in any permit issued to the treatment works." *Id.* (emphasis added). Similarly, the report accompanying the House version of the bill, which contained parallel provisions for enhancement of penalties, states that the proposed amendments were to "provide penalties for dischargers or individuals who knowingly or negligently violate *or cause the violation of* certain of the Act's requirements." H.R.Rep. No. 189, 99th Cong., 1st Sess. 29–30 (1985) (emphasis added). Because they speak in terms of "causing" a violation, the congressional explanations of the new penalty provisions strongly suggest that criminal sanctions are to be imposed on an individual who knowingly engages in conduct that results in a permit violation, regardless of whether the polluter is cognizant of the requirements or even the existence of the permit.

Our conclusion that "knowingly" does not refer to the legal violation is fortified by decisions interpreting analogous public welfare statutes. The leading case in this area is *United States v. International Minerals & Chem. Corp.*, 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971). In *International Minerals*, the Supreme Court construed a statute which made it a crime to "knowingly violate[] any ... regulation" promulgated by the ICC pursuant to 18 U.S.C. § 834(a), a provision authorizing the agency to formulate

regulations for the safe transport of corrosive liquids. *Id.* at 559, 91 S.Ct. at 1699. The Court held that the term "knowingly" referred to the acts made criminal rather than a violation of the regulation, and that "regulation" was a shorthand designation for the specific acts or omissions contemplated by the act. *Id.* at 560–62, 91 S.Ct. at 1699–1700. "[W]here ... dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *Id.* at 565, 91 S.Ct. at 1701–02.

This court followed *International Minerals* in *United States v. Hoflin*, 880 F.2d 1033 (9th Cir.1989), *cert. denied*, 493 U.S. 1083, 110 S.Ct. 1143, 107 L.Ed.2d 1047 (1990), when it held that knowledge of the absence of a permit is not an element of the offense defined by 42 U.S.C. § 6928(d)(2)(A), part of the Resource Conservation and Recovery Act ("RCRA"). *Id.* at 1039. "There can be little question that RCRA's purposes, like those of the Food and Drug Act, '... touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection.'" *Id.* at 1038 (quoting *United States v. Dotterweich*, 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943) (construing Food, Drug and Cosmetic Act)); *see also United States v. Sherbondy*, 865 F.2d 996, 1001–03 (9th Cir.1988) (use of word "knowingly" in 18 U.S.C. §§ 922(g) & 924(A)(1)(B), part of Firearms Owners' Protection Act, does not require proof that defendant knew he was violating law).[5] Other courts have also followed *International Min-*

---

Cir.1991); *United States v. Frezzo Bros., Inc.*, 546 F.Supp. 713, 720–21 (E.D.Pa.1982), *aff'd*, 703 F.2d 62 (3d Cir.), *cert. denied*, 464 U.S. 829, 104 S.Ct. 106, 78 L.Ed.2d 109 (1983).

5. Weitzenhoff argues that this case is controlled by *United States v. Speach*, 968 F.2d 795, 796–97 (9th Cir.1992), in which we held that 42 U.S.C. § 6928(d)(1), which imposes criminal liability on parties who "knowingly transport[] ... hazardous waste ... to a facility which does not have a permit," requires that the transporter know that he acted in violation of the statute. This argument is unavailing because *Speach* recognizes the general rule that public welfare offenses are not to be construed to require proof that the defendant knew he was violating the law in the

absence of clear evidence of contrary congressional intent and finds only a narrow exception to this general rule. In *Speach*, we relied on the fact that the defendant was not the permittee but simply the individual who transported waste to the permittee, and, as contrasted to the permittee was not "the person in the best position to know the facility's permit status." *Id.* at 797. Although we considered it unreasonable to put the defendant at risk for failing to ascertain the permit status of the receiving facility, we recognized that such a risk is not unreasonable when the permittee is also the defendant. *Id.* In this case, as the permittees, appellants are clearly in the best position to know their own permit status, and are among those persons upon whom the *Speach* court would impose liability.

*erals* by similarly construing the knowledge requirement in statutes that regulate deleterious devices or obnoxious waste materials. *E.g., United States v. Laughlin,* 10 F.3d 961, 965–66 (2d Cir.1993) (§ 6928(d)(2)(A) of RCRA), *cert. denied,* —— U.S. ——, 114 S.Ct. 1649, 128 L.Ed.2d 368 (1994); *United States v. Buckley,* 934 F.2d 84, 88 (6th Cir.1991) (pre–1990 version of § 7413(c)(1)(C) of the Clean Air Act); *United States v. Dee,* 912 F.2d 741, 745 (4th Cir.1990), *cert. denied,* 499 U.S. 919, 111 S.Ct. 1307, 113 L.Ed.2d 242 (1991) (§ 6928(d)(2)(A) of RCRA); *United States v. Corbin Farm Serv.,* 444 F.Supp. 510, 519–20 (E.D.Cal.), *aff'd,* 578 F.2d 259 (9th Cir.1978) (Federal Insecticide, Fungicide and Rodenticide Act).[6]

Appellants seek to rely on the Supreme Court's decision in *Liparota v. United States,* 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), to support their alternative reading of the intent requirement. *Liparota* concerned 7 U.S.C. § 2024(b)(1), which provides that anyone who "knowingly uses, transfers, acquires, alters, or possesses [food stamp] coupons or authorization cards in any manner not authorized by [the statute] or regulations" is subject to a fine or imprisonment. *Id.* at 420, 105 S.Ct. at 2085. The Court, noting that the conduct at issue did not constitute a public welfare offense, distinguished the *International Minerals* line of cases and held that the government must prove the defendant knew that his acquisition or possession of food stamps was in a manner unauthorized by statute or regulations. *Id.* at 432–33, 105 S.Ct. at 2092.

Subsequent to the filing of the original opinion in this case, the Supreme Court decided two cases which Weitzenhoff contends call our analysis into question. *See Ratzlaf v. United States,* —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994); *Staples v. United States,* —— U.S. ——, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). We disagree.

The statute in *Ratzlaf* does not deal with a public welfare offense, but rather with violations of the banking statutes. The Court construed the term "willfully" in the anti-structuring provisions of the Bank Secrecy Act to require both that the defendant knew he was structuring transactions to avoid reporting requirements and that he knew his acts were unlawful. The Court recognized that the money structuring provisions are not directed at conduct which a reasonable person necessarily should know is subject to strict public regulation and that the structuring offense applied to all persons with more than $10,000, many of whom could be engaged in structuring for innocent reasons. *Ratzlaf,* —— U.S. at —— – ——, 114 S.Ct. at 660–62. In contrast, parties such as Weitzenhoff are closely regulated and are discharging waste materials that affect public health. The *International Minerals* rationale requires that we impute to these parties knowledge of their operating permit. This was recognized by the Court in *Staples.*

The specific holding in *Staples* was that the government is required to prove that a defendant charged with possession of a machine gun knew that the weapon he possessed had the characteristics that brought it within the statutory definition of a machinegun. But the Court took pains to contrast the gun laws to other regulatory regimes, specifically those regulations that govern the handling of "obnoxious waste materials." *See Staples,* —— U.S. at ——, 114 S.Ct. at 1798. It noted that the mere innocent ownership of guns is not a public welfare offense. *Id.* at ——, 114 S.Ct. at 1804. The Court focussed on the long tradition of widespread gun ownership in this country and, recognizing that approximately 50% of American homes contain a firearm, *id.* at ——, 114 S.Ct. at 1801, acknowledged that mere ownership of a gun is not sufficient to place

---

**6.** Like the court in *International Minerals,* we construe the language in § 1319(c)(2)(A) prohibiting knowing violation of "any permit condition" as a "shorthand designation for specific acts" that violate the CWA. *See International Minerals,* 402 U.S. at 567, 91 S.Ct. at 1703. In both § 1319(c)(2)(A) and the statute in question in *International Minerals,* the penalty provisions were drafted in a general fashion to encompass a wide variety of possible violations of the Acts and

the word "knowingly" is used to reflect a requirement that the government prove general intent in order to establish a violation. *See also Buckley,* 934 F.2d at 88 ("knowingly ... violates section 7411(e) ..."); *Sherbondy,* 865 F.2d at 1002 ("knowingly violates subsection ... (g) ... of section 922"); *Corbin Farm Serv.,* 444 F.Supp. at 518 ("knowingly violates any provision of this subchapter").

people on notice that the act of owning an unregistered firearm is not innocent under the law.

*Staples* thus explicitly contrasted the mere possession of guns to public welfare offenses, which include statutes that regulate " 'dangerous or deleterious devices or products or obnoxious waste materials,' " *id.* at ——, 114 S.Ct. at 1800, and confirmed the continued vitality of statutes covering public welfare offenses, which "regulate potentially harmful or injurious items" and place a defendant on notice that he is dealing with a device or a substance "that places him in 'responsible relation to a public danger.' " *Id.* "[I]n such cases Congress intended to place the burden on the defendant to ascertain at his peril whether [his conduct] comes within the inhibition of the statute." *Id.* at ——, 114 S.Ct. at 1798 (citations and internal quotations omitted).

Unlike "[g]uns [which] in general are not 'deleterious devices or products or obnoxious waste materials,' *International Minerals, supra* [402 U.S.], at 565 [91 S.Ct. at 1702], that put their owners on notice that they stand 'in responsible relation to a public danger[,]' *Dotterweich,* 320 U.S. at 281 64 S.Ct. at 136]," *Staples,* —— U.S. at ——, 114 S.Ct. at 1800, the dumping of sewage and other pollutants into our nation's waters is precisely the type of activity that puts the discharger on notice that his acts may pose a public danger. Like other public welfare offenses that regulate the discharge of pollutants into the air, the disposal of hazardous wastes, the undocumented shipping of acids, and the use of pesticides on our food, the improper and excessive discharge of sewage causes cholera, hepatitis, and other serious illnesses, and can have serious repercussions for public health and welfare.[7]

The criminal provisions of the CWA are clearly designed to protect the public at large from the potentially dire consequences of water pollution, *see* S.Rep. No. 99–50, 99th Cong., 1st Sess. 29 (1985), and as such fall within the category of public welfare legislation. *International Minerals* rather than *Liparota* controls the case at hand. The government did not need to prove that Weitzenhoff and Mariani knew that their acts violated the permit or the CWA.

B. Expert Testimony

The essence of Weitzenhoff and Mariani's defense was that their clandestine dumping of thousands of gallons of toxic sludge into the ocean at Sandy Beach was an effort to restore the plant's biological balance so as to avoid a complete plant shutdown and avert environmental disaster. They claim that the discharges of WAS were fully consistent with the NPDES permit. The central issue at trial, therefore, was the meaning of the permit.

In addition to establishing TSS and BOD limits for the effluent discharged at Sandy Beach and imposing monitoring requirements, the permit issued to the East Honolulu plant provided that substances removed from the wastewater could only be disposed of "in a manner such as to prevent any pollutant from such materials from entering navigable water." (Mariani Excerpts of Record ("M.E.R.") at 68) (NPDES permit). "Removed substances," according to the permit, include "[s]olids, sludges, filter backwash, or other pollutants removed in the course of treatment or control of wastewaters." (*Id.*)

The permit also regulates "bypass," defined as "the intentional diversion of waste

---

7. In *Staples,* the Court also noted that the penalty attached to a violation of a criminal statute in the past has been a relevant factor in determining whether the statute defines a public welfare offense. The Court recognized that public welfare offenses originally involved statutes that provided only light penalties such as fines or short jail sentences, *see* —— U.S. at ——, 114 S.Ct. at 1802, but that modern statutes now punish public welfare offenses with much more significant terms of imprisonment. *E.g., International Minerals,* 402 U.S. 558, 91 S.Ct. 1697 (ten years imprisonment if death or bodily injury results from violation); *United States v. Freed,* 401 U.S. 601, 609–

10, 91 S.Ct. 1112, 1118–1119, 28 L.Ed.2d 356 (1971) (five years imprisonment for possession of unregistered grenade); *Hoflin,* 880 F.2d 1033 (two years imprisonment for certain violations of RCRA). While the *Staples* opinion expresses concern with this evolution of enhanced punishments for public welfare offenses, it refrains from holding that public welfare offenses may not be punished as felonies. *Staples,* —— U.S. at ——, 114 S.Ct. at 1804 (stating that the early cases suggest that public welfare offenses might not extend to felonies, but noting that "[w]e need not adopt such a definitive rule of construction to decide this case").

streams from any portion of a treatment facility." (*Id.* at 66.) Under the permit, bypass is generally prohibited, except to "prevent loss of life, personal injury, or severe property damage" and in the absence of feasible alternatives. (*Id.*) The permit provides, however, that where it will not cause effluent limitations to be exceeded, "[t]he permittee may allow any bypass to occur, but only if it ... is for essential maintenance to assure efficient operation." (*Id.*)

Weitzenhoff and Mariani assert that the discharges were permissible bypasses. They claim that WAS is not a "removed substance," that the discharges they oversaw were for the purpose of "essential maintenance," and that, because they are properly considered "bypasses," the discharges were not required to be reflected in the monitoring reports submitted to government authorities.

The trial judge—concerned that were he to construe the permit, "we [wouldn't] have a case.... [w]e would just have a bench trial," (4 R.T. at 168)—treated the interpretation of the permit as a question for the jury. Consistent with this approach, the court permitted witnesses familiar with the wastewater management field to testify about the various technical terms within and obligations imposed by the permit. Since both sides presented witnesses on these issues, the explications of the permit were, as might be expected, contradictory. For example, one government witness testified that a discharge of WAS from a WAS holding tank to an outfall would constitute the disposal of a removed substance in violation of the permit. But he was contradicted by a defense witness who testified that WAS was not a "removed substance" and therefore did not come under the prohibition. While the same government witness defined "essential maintenance" as pertaining only to the maintenance of the plant's "physical facilities," the defense expert stated that the term could apply to maintenance of the plant's biological process as well as its physical facilities. The court did not resolve these conflicts in its jury charge but instead instructed the jury to "construe" the permit based on "the plain meaning of the language therein" and the testimony of the expert and other witnesses. (14 R.T. at 122.)

Weitzenhoff and Mariani argue that the testimony defining key terms of the permit and explaining its prohibitions amounted to an impermissible delegation of the district judge's duties because, in effect, it was witnesses who instructed the jury on the law rather than the judge. We agree with appellants in this assessment.

■ The admission of expert testimony is within the discretion of the trial court and reversible only for abuse of discretion or manifest error. *United States v. Arvin,* 900 F.2d 1385, 1388–89 (9th Cir.1990), *cert. denied,* 498 U.S. 1024, 111 S.Ct. 672, 112 L.Ed.2d 664 (1991). Expert testimony is properly admissible when it serves to assist the trier of fact to understand the evidence or determine a fact in issue. *United States v. Brodie,* 858 F.2d 492, 496 (9th Cir.1988). It is well settled, however, that the judge instructs the jury in the law. *Id.* "Resolving doubtful questions of law is the distinct and exclusive province of the trial judge." *Id.* at 497.

■ Here the district court did not decide the issues of law raised by the parties. Instead of applying the court's interpretation of the law to the facts, then, the jurors applied their own rendition(s) of the law, presumably derived to some degree from the conflicting expert testimony, to the facts. Although the testimony of the witnesses regarding technical terms in the permit might have been permissible had the judge proceeded properly to instruct the jury, *see* Fed.R.Evid. 702 (expert testimony admissible if it will assist the trier of fact), 704 (opinion on ultimate issue to be decided by factfinder not necessarily objectionable), in this case it compounded the error of consigning the interpretation of the law to the jury. The court's admission of expert testimony on contested issues of law in lieu of instructing the jury was manifestly erroneous.[8]

---

8. We note that the defense contributed to this error by insisting that the court not define any of the permit's terms for the jury in its charge, but merely instruct the jury to "follow the *plain meaning* of the language" in the permit.

(U.S.E.R. at 74.) The defendants, however, had initially objected to the admission of any expert testimony concerning permit terms. After the court ruled such testimony admissible, defendants presented their own expert testimony to

■ Nonetheless, we hold that the error was harmless because, under a proper interpretation of the permit, the discharges admitted to by Weitzenhoff and Mariani necessarily violated the permit.[9] Since construction of the permit is a matter of law, we are in a position to interpret the permit provisions at issue. *Hemlani v. Guerrero,* 902 F.2d 1412, 1415 (9th Cir.1990) ("The interpretation of this statute is purely a question of law, the issue has been fully briefed, and we are in as good a position as the [district] court to decide if the statute means what it says."). We note that in deciding what the provisions mean, we need not choose between the conflicting expert opinions; the critical terms are either defined in the permit itself or their meaning is apparent from EPA's commentary on its permitting guidelines. As we are able to accomplish the task of permit interpretation without turning to the experts, we are not hampered by questions of witness credibility, which of course could not be resolved by us on appeal. *United States v. Gordon,* 844 F.2d 1397, 1405 (9th Cir.1988) ("Questions of credibility are for the jury to decide and are generally immune from appellate review.")

■ We begin by observing that, notwithstanding the "expert" testimony to the contrary, the excess WAS that was separated out from the plant's treatment process to be stored and eventually disposed of clearly falls within the permit's definition of a "removed substance" because it was a "sludge[ ] ... removed in the course of treatment or control of wastewaters." (M.E.R. at 68.) As such, it could not be discharged into the ocean unless the discharge constituted a permissible bypass of the treatment system.

■ Even assuming that the oceanic dumping of WAS at Sandy Beach did not violate the East Honolulu facility's effluent standards,[10] a doubtful proposition, we hold that the discharges were not permissible by-

passes because they were not for "essential maintenance to assure efficient operation." (*Id.* at 66.) An NPDES permit must conform to EPA regulations. *See* 40 C.F.R. § 122.1 *et seq.* (permitting requirements). In establishing the guideline prohibiting bypass except where necessary for essential maintenance, 40 C.F.R. § 122.41(m), the EPA explained that "[g]enerally, maintenance is that which is necessary to maintain the performance, removal efficiency and effluent quality of the *pollution control equipment.* However, for the purposes of this section, it is necessary to distinguish between maintenance that is 'essential' and that which is routine." 49 Fed.Reg. 38,037 (1984) (emphasis added). The discussion in the Federal Register focuses on necessary repairs and upkeep of plant equipment and emphasizes that if it is feasible to perform the maintenance "with no loss in treatment plant performance," the maintenance is not considered "essential" for the purposes of the bypass exception. *Id.* There is no indication that the EPA considered anything other than unavoidable measures to ensure the continuing operation of plant equipment to be "essential maintenance."

■ The EPA's interpretation of its bypass regulation is entitled to considerable weight. *Force v. Director, Office of Workers' Compensation Programs,* 938 F.2d 981, 983 (9th Cir.1991); *Natural Resources Defense Council, Inc. v. U.S. Environmental Protection Agency,* 822 F.2d 104, 122 (D.C.Cir.1987) (upholding bypass provision). We therefore reject appellants' interpretation of the bypass exception as authorizing their wholesale dumping of WAS into the ocean and circumvention of the plant's monitoring apparatus. The discharges they directed were not for the purpose of maintaining plant equipment. Nor were they essential, for the record establishes that a ready alternative existed:

counter that of the government witnesses. Under these circumstances, we decline to hold that appellants invited the error.

9. The government presented evidence and arguments indicating that the permit was violated in more than one way. There was no special verdict in the case, however, and consequently, there is no means for us to ascertain which theory or theories the jury adopted. Even

though the government presented compelling evidence that the discharges caused the plant's effluent limitations to be exceeded, we assume for the purposes of this analysis that the jury rejected this evidence, as it was entitled to, and rely only on appellants' admissions to support our conclusion that the permit was violated.

10. *See supra* note 6.

Weitzenhoff and Mariani could have had the excess WAS hauled away.

Finally, we note that appellants' attempt to construe the permit as allowing these discharges turns the entire statutory scheme on its head. In keeping with the goal of the CWA, the EPA's bypass rule was devised to ensure "that the applicable treatment technology, implemented for the purpose of achieving pollution reduction equivalent to the 'best technology,' be operated as designed." *Natural Resources Defense Council,* 822 F.2d at 124. To endorse appellants' interpretation would be to grant permit holders carte blanche to pollute whenever the slightest managerial inconvenience presented itself. We are certain that this is not what Congress intended.

## C. Vagueness

■ Weitzenhoff and Mariani contend that, especially in the absence of a requirement that they knew they were violating the law, the NPDES permit is unconstitutionally vague. They assert that key provisions of the permit, in particular those that were debated at trial, have no established meaning. The district court declined to rule on defendants' vagueness claim at a pretrial hearing but denied a motion for acquittal based on the ambiguity of the permit after the close of the government's case.

■ Whether the permit was unconstitutionally vague is a question of law which we review de novo. *United States v. Christopher,* 700 F.2d 1253, 1258 (9th Cir.), *cert. denied,* 461 U.S. 960, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983). "A defendant is deemed to have fair notice of an offense if a reasonable person of ordinary intelligence would understand that his or her conduct is prohibited by the law in question." *United States v. Fitzgerald,* 882 F.2d 397, 398 (9th Cir.1989). In evaluating a question of vagueness, we ordinarily look to the common understanding of the terms of a statute. *Id.* However, if the statutory prohibition "involves conduct of a select group of persons having specialized knowledge, and the challenged phraseology is indigenous to the idiom of that class, the standard is lowered and a court may uphold a statute which 'uses words or phrases having a technical or other special meaning, well enough known to enable those

within its reach to correctly apply them.'" *Precious Metals Assocs., Inc. v. Commodity Futures Trading Commission,* 620 F.2d 900, 907 (1st Cir.1980) (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)).

Pursuant to the preceding analysis of the permit's terms, which, as we have demonstrated, have meaning in the context of the EPA regulatory scheme, we have no trouble in upholding the permit against appellants' vagueness challenge. Weitzenhoff and Mariani were knowledgeable in the wastewater field and can be expected to have understood what the permit meant. In particular, they should have known that it did not give them license to dump thousands of gallons of partially treated sewage into the ocean on a regular basis.

We are further persuaded that appellants had adequate notice of the illegality of their dumping by the considerable pains they took to conceal their activities. The discharges were effected mainly at night; plant personnel were not to discuss them; and Weitzenhoff and Mariani consistently repeatedly denied the illicit operation when questioned by health authorities. These are not the ways of conscientious managers seeking to safeguard the environment.

Although we affirm the convictions on the basis of Weitzenhoff and Mariani's factual admissions and our interpretation of the permit rather than attempting to divine the facts upon which the jury based its verdict, we nonetheless address the additional concerns raised by appellants relating to the presentation of the case to the jury. We do this because had the court erroneously deprived the jury of an opportunity to acquit or wrongly refused to grant a mistrial, we might not be in a position to affirm. That is, had the jury acquitted or a mistrial been declared, there would be no convictions to uphold.

## D. Exclusion of Evidence

■ At trial, defendants sought to introduce an excerpt from the Federal Register describing a regulation proposed in 1984 by the EPA but never adopted. As explained in 49 Federal Register 38,036 (1984), the regu-

lation would have permitted bypass of effluent from a wastewater treatment facility where the resultant effluent is in compliance with permit limitations. The proposal would allow any bypass which does not cause a violation of permit limitations or other permit conditions. However, to ensure that permit limitations are, in fact, not exceeded during the bypass, the proposed amendment would require permittees to monitor all affected discharge points at the time of any bypass.

(Weitzenhoff Excerpts of Record at 74.) Weitzenhoff and Mariani claim this should have been admitted as evidence because, combined with the fact that it was never adopted, it suggests that the EPA did not require them to monitor the discharges they characterize as bypasses. The district court held the excerpt inadmissible since the regulation was never adopted, the language cited by the defense was of dubious significance, and such "evidence" would confuse the jury.

We review the exclusion of the evidence for abuse of discretion. *United States v. Kessi,* 868 F.2d 1097, 1107 (9th Cir.1989); *United States v. Soulard,* 730 F.2d 1292, 1296 (9th Cir.1984). Although the explanation of the proposed regulation might properly have been considered (or disregarded) by the court in ruling on the legal issues in the case, it was not relevant to the jury's determination of the facts. Thus, notwithstanding the fact that the jury was impermissibly assigned the task of interpreting the permit, the district court did not abuse its discretion in excluding the Federal Register excerpt from the jury's consideration.

E. Entrapment by Estoppel Defense

■■■■ The district court ruled after the close of evidence that it would not give Weitzenhoff and Mariani's proposed jury instruction on the elements of an entrapment by estoppel defense because the defense was not warranted by the law or the facts of the case. Appellants claim the court's refusal to give the instruction warrants reversal.

"A defendant is entitled to an instruction covering a theory of defense if it has a basis in law and there is some foundation for it in the evidence." *United States v. Ibarra–Alcarez,* 830 F.2d 968, 973 (9th Cir.1987). A trial court's determination that the evidence

was insufficient to justify the giving of an instruction on a theory of defense is a question of law which we review de novo. *Id.*

■■■■ Entrapment by estoppel applies when an authorized government official tells the defendant that certain conduct is legal and the defendant believes the official. *United States v. Brebner,* 951 F.2d 1017, 1024 (9th Cir.1991). To invoke the entrapment by estoppel defense, the defendant must show that he relied on the official's statement and that his reliance was reasonable in that a person sincerely desirous of obeying the law would have accepted the information as true and would not have been put on notice to make further inquiries. *United States v. Lansing,* 424 F.2d 225, 227 (9th Cir.1970).

Weitzenhoff and Mariani contend that the jury should have been permitted to consider whether they were entrapped by the government, for two reasons: because they were entitled to rely upon the "plain language" of the permit as a "comprehensive official statement of the law"—at the same time, of course, claiming that they abided by the permit; and because of the fact that regulatory authorities had previously permitted them to haul excess WAS to the Sand Island waste treatment facility where it only underwent a primary treatment process before being discharged into the ocean. According to Weitzenhoff and Mariani, the authorization to haul the WAS to the another facility that lacked a secondary treatment process somehow implies that it was acceptable to discharge the WAS from the East Honolulu plant without additional treatment.

The first of appellants' theories is flawed because it merely begs the critical inquiry in this case, that is, the correct interpretation of the permit. It would have been entirely superfluous to have the jury decide whether appellants properly relied on the permit since no one disputes that they were bound by it.

The second asserted rationale is a tortured one that does not make out a claim of entrapment by estoppel. Even if disposing of the WAS by hauling it to the Sand Island facility could somehow plausibly be equated with dumping it into the Sandy Beach outfall,

appellants do not point to a statement on the part of a government official upon which they relied in reaching this conclusion. Moreover, the fact that it was lawful to discharge WAS at Sand Island without secondary treatment has no bearing on the discharge limitations at the East Honolulu plant, which operated under its own permit.[11] If Weitzenhoff and Mariani had had a genuine desire to obey the law, they would have sought advice from the appropriate authorities as to how properly to dispose of the excess WAS.

**F. Prosecutorial Misconduct**

 Weitzenhoff and Mariani object to what they characterize as the prosecutor's deliberate attempts to elicit irrelevant and inflammatory testimony regarding the potential health effects of the WAS discharges despite the trial court's ruling limiting such testimony. "A claim of prosecutorial misconduct must be viewed in the entire context of the trial." *United States v. Christophe,* 833 F.2d 1296, 1300 (9th Cir.1987). Reversal is justified only if the alleged misconduct materially affected the verdict or deprived the defendant of a fair trial. *Id.* at 1301; *see also United States v. Simtob,* 901 F.2d 799, 806 (9th Cir.1990) ("[P]rosecutorial misconduct invites reversal if it appears more probable than not that the alleged misconduct affected the jury's verdict."). Depending upon the circumstances, a prompt and effective admonishment of counsel or curative instruction from the trial judge may effectively "neutralize the damage." *Simtob,* 901 F.2d at 806.

During the first part of the trial, the government introduced evidence about the health concerns associated with sewage through three witnesses who testified about the waste treatment process and its goal of ridding wastewater of disease-causing microorganisms to the extent possible. One of these witnesses, Ken Greenberg, noted that the discharge from a treatment facility could have adverse effects on the receiving waters and harm swimmers. Defendants failed to object to any of this testimony.

Later on in the trial, however, when the government asked a question of another wit-

ness concerning the length of the outfall at Sandy Beach, defendants objected on relevance grounds. The government argued that the testimony was relevant to show defendants' motive in concealing their activities. The court, while expressing initial concern about the lack of relevance and prejudicial effects of injecting "gruesome" testimony about "viruses floating in the water," ruled that testimony regarding the potential health risks of discharging WAS into the water could come in, so long as the prosecutor stayed away from detailed accounts of "viruses and AIDS and all other kinds of stuff." (8 R.T. at 36.)

Edmund Pestana, a lifeguard at Sandy Beach, subsequently testified for the government about the plumes of brown water he had observed coming out of the outfall. The prosecutor asked whether Pestana was aware of people getting sick at the beach, to which the lifeguard answered "yes." The court sustained defendants' objection and instructed the jury to disregard the response. Later, Pestana was asked what he noticed during an incident in which he had windsurfed through discolored water. Pestana stated that he knew he was going through sewage water: "It smelled of it, and it looked of it, and it's nothing less than what your imagination can conjure up. I was scared to fall off my board and into it and get my face wet or anything like that in my mouth or my ears or my nose." (8 R.T. at 126.) The judge ordered the quoted testimony stricken and instructed the jury to disregard it.

At the conclusion of Pestana's testimony, defendants moved for a mistrial, alleging that the prosecutor had deliberately violated the court's ruling regarding the limitations on such testimony. The court denied the motion, noting its curative instructions and the fact that it was common knowledge that WAS, if ingested, would pose a health risk.

Appellants also point to the prosecutor's cross-examination of their wastewater expert regarding the length of the Sandy Beach versus the Sand Island outfall. In the course of this exchange, the court sustained the

---

**11.** The government points out that the outfall for the Sand Island facility is many times longer than the one at Sandy Beach, which accounts for the stricter waste handling requirements imposed on the East Honolulu plant.

defendants' objections to two questions regarding whether there were many swimmers near these outfalls.

Finally, in his closing argument, the prosecutor drew attention to the public health hazard engendered by defendants' activities, stating that Weitzenhoff and Mariani "placed at risk the hundreds of people, surfers, body boarders, swimmers, divers, fishermen, people who use Sandy Beach every day." (14 R.T. at 9–10.) The court did not respond to these remarks as defendants did not object to them.

Although the challenged testimony and prosecutorial remarks were of questionable relevance and indeed conveyed repugnant images, considered in the context of the entire proceeding, we do not believe they could have materially affected the verdict or rendered the trial unfair. A substantial amount of testimony regarding the health risks associated with WAS—indeed, the most specific references to viruses, bacteria, and so forth—came in without objection prior to the testimony appellants claim was so prejudicial. As for the most exceptionable testimony, that of the lifeguard, the court sustained objections and issued prompt curative instructions.

■ Most significant to our analysis, though, is that throughout the trial, Weitzenhoff and Mariani attempted to portray their discharging of WAS into the ocean as a responsible tactic to forestall environmental disaster, thus putting the safety of the public at issue. Both defendants made this point in their opening statements. Later on, Mariani testified that in ordering the discharges, the public health was "first and foremost" in his mind. (11 R.T. at 23, 25.) Against this backdrop, the prosecutor's few additional questions touching upon the health issue and the comments in his summation cannot be considered misconduct.

G. Upward Adjustment of Mariani's Sentence

■ Mariani contends that the court's two-point upward adjustment of his offense level pursuant to U.S.S.G. § 3C1.1 for obstruction of justice based on the court's find-

ing that he perjured himself was not warranted by his conduct at trial and represents an unconstitutional interference with his right to testify.[12] We review the court's interpretation of the sentencing guidelines de novo, and the factual findings underlying the upward adjustment for clear error. *United States v. McAninch,* 994 F.2d 1380, 1383 (9th Cir.1993).

In sentencing Mariani, the court expressly adopted the determination of the presentence report that Mariani had lied in his testimony at trial. The presentence report notes, with support in the record, that Mariani perjured himself on several occasions when he stated that he believed that the discharges of WAS did not violate the permit. The record shows, for example, that at trial, Mariani consciously underrepresented the size of a WAS holding tank, thus underrepresenting the potential size and impact of the discharges from it. His testimony that he believed that his activities were within the scope of the permit is belied by his efforts to conceal them. The district court's findings in support of the upward adjustment were not clearly erroneous.

■ Mariani's constitutional challenge to the obstruction of justice enhancement is unavailing. The Supreme Court recently rejected the contention, as had this court, that a sentencing increase based on false testimony unconstitutionally burdens a defendant's right to testify. *United States v. Dunnigan,* —— U.S. ——, ——, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993); *see also United States v. Torres–Rodriguez,* 930 F.2d 1375, 1389–90 (9th Cir.1991); *United States v. Barbosa,* 906 F.2d 1366, 1369–40 (9th Cir.), *cert. denied,* 498 U.S. 961, 111 S.Ct. 394, 112 L.Ed.2d 403 (1990). "[A] defendant's right to testify does not include a right to commit perjury." *Dunnigan,* —— U.S. at ——, 113 S.Ct. at 1117. Mariani's sentence was justly enhanced.

We **AFFIRM** both the convictions and Mariani's sentence.

---

12. Weitzenhoff elected not to testify at trial.

## DISSENTING OPINION FROM ORDER REJECTING SUGGESTION FOR REHEARING EN BANC

### Aug. 8, 1994

KLEINFELD, Circuit Judge, with whom Circuit Judges REINHARDT, KOZINSKI, TROTT, and T.G. NELSON join, dissenting from the order rejecting the suggestion for rehearing en banc.

I respectfully dissent from our decision to reject the suggestion for rehearing en banc.

Most of us vote against most such petitions and suggestions even when we think the panel decision is mistaken. We do so because federal courts of appeals decide cases in three judge panels. En banc review is extraordinary, and is generally reserved for conflicting precedent within the circuit which makes application of the law by district courts unduly difficult, and egregious errors in important cases. In my view, this is a case of exceptional importance, for two reasons. First, it impairs a fundamental purpose of criminal justice, sorting out the innocent from the guilty before imposing punishment. Second, it does so in the context of the Clean Water Act. This statute has tremendous sweep. Most statutes permit anything except what is prohibited, but this one prohibits all regulated conduct involving waters and wetlands except what is permitted. 33 U.S.C. § 1311(a); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). Much more ordinary, innocent, productive activity is regulated by this law than people not versed in environmental law might imagine.

The harm our mistaken decision may do is not necessarily limited to Clean Water Act cases. Dilution of the traditional requirement of a criminal state of mind, and application of the criminal law to innocent conduct, reduces the moral authority of our system of criminal law. If we use prison to achieve social goals regardless of the moral innocence of those we incarcerate, then imprisonment loses its moral opprobrium and our criminal law becomes morally arbitrary.

We have now made felons of a large number of innocent people doing socially valuable work. They are innocent, because the one thing which makes their conduct felonious is something they do not know. It is we, and not Congress, who have made them felons. The statute, read in an ordinary way, does not. If we are fortunate, sewer plant workers around the circuit will continue to perform their vitally important work despite our decision. If they knew they risk three years in prison, some might decide that their pay, though sufficient inducement for processing the public's wastes, is not enough to risk prison for doing their jobs. We have decided that they should go to prison if, unbeknownst to them, their plant discharges exceed permit limits. Likewise for power plant operators who discharge warm water into rivers near their plants, and for all sorts of other dischargers in public and private life. If they know they are discharging into water, have a permit for the discharges, think they are conforming to their permits, but unknowingly violate their permit conditions, into prison they go with the violent criminals.

The statute does not say that. The statute at issue makes it a felony, subject to three years of imprisonment, to "knowingly violate[ ] ... any permit condition or limitation." 33 U.S.C. § 1319(c)(2)(A).[1] Here is the statutory scheme, with the portion applied in *Weitzenhoff* in boldface:

"Any person who ...

"negligently violates [various sections of the Clean Water Act] ... or any permit condition or limitation ... [commits a misdemeanor]. 33 U.S.C. § 1319(c)(1)(A);

"negligently introduces into a sewer system or a publicly owned treatment works any pollutant or hazardous substance which such person knew or reasonably should have known could cause personal injury or property damage or ... which causes such treatment works to violate any effluent limitation or condition in any permit ... [commits a misdemeanor]. 33 U.S.C. § 1319(c)(1)(B);

"**knowingly violates [various sections of the Clean Water Act] ... or any permit condition or limitation ... [commits a felony]. 33 U.S.C. § 1319(c)(2)(A);**

---

1. A 1987 amendment raised the crime from a misdemeanor to a felony, and changed the intent requirement from "willfully" to "knowingly." Pub.L. No. 100–4, § 312, 101 Stat. 42 (1987).

"knowingly introduces into a sewer system or into a publicly owned treatment works any pollutant or hazardous substance which such person knew or reasonably should have known could cause personal injury or property damage or ... which causes such treatment works to violate any effluent limitation or condition in a permit ... [commits a felony]. 33 U.S.C. § 1319(c)(2)(B);

"knowingly violates [various sections of the Clean Water Act] ... or any permit condition or limitation ... and who knows at that time that he thereby places another person in imminent danger of death or serious bodily injury ... [commits a felony punishable by up to 15 years imprisonment]. 33 U.S.C. § 1319(c)(3)(A).

In this case, the defendants, sewage plant operators, had a permit to discharge sewage into the ocean, but exceeded the permit limitations. The legal issue for the panel was what knowledge would turn innocently or negligently violating a permit into "knowingly" violating a permit. Were the plant operators felons if they knew they were discharging sewage, but did not know that they were violating their permit? Or did they also have to know they were violating their permit? Ordinary English grammar, common sense, and precedent, all compel the latter construction.

As the panel opinion states the facts, these two defendants were literally "midnight dumpers." They managed a sewer plant and told their employees to dump 436,000 pounds of sewage into the ocean, mostly at night, fouling a nearby beach. Their conduct, as set out in the panel opinion, suggests that they must have known they were violating their National Pollution Discharge Elimination System (NPDES) permit. *United States v. Weitzenhoff,* 1 F.3d 1523, 1527–28 (9th Cir. 1993). But we cannot decide the case on that basis, because the jury did not. The court instructed the jury that the government did not have to prove the defendants knew their conduct was unlawful, and refused to instruct the jury that a mistaken belief that the discharge was authorized by the permit would be a defense. Because of the way the jury was instructed, its verdict is consistent with the proposition that the defendants honestly and reasonably believed that their NPDES permit authorized the discharges.

This proposition could be true. NPDES permits are often difficult to understand and obey. The EPA had licensed the defendants' plant to discharge 976 pounds of waste per day, or about 409,920 pounds over the fourteen months covered by the indictment, into the ocean. The wrongful conduct was not discharging waste into the ocean. That was socially desirable conduct by which the defendants protected the people of their city from sewage-borne disease and earned their pay. The wrongful conduct was violating the NPDES permit by discharging 26,000 more pounds of waste than the permit authorized during the fourteen months. Whether these defendants were innocent or not, in the sense of knowing that they were exceeding their permit limitation, the panel's holding will make innocence irrelevant in other permit violation cases where the defendants had no idea that they were exceeding permit limits. The only thing they have to know to be guilty is that they were dumping sewage into the ocean, yet that was a lawful activity expressly authorized by their federal permit.

The statute says "knowingly violate[s] ... any permit condition or limitation." "Knowingly" is an adverb. It modifies the verb "violates." The object of the verb is "any permit condition or limitation." The word "knowingly" is placed before "violates" to "explain its meaning in the case at hand more clearly." 1 George O. Curme, A Grammar of the English Language 72 (1935). Congress has distinguished those who knowingly violate permit conditions, and are thereby felons, from those who unknowingly violate permit conditions, so are not. The panel reads the statute as though it says "knowingly discharges pollutants." It does not. If we read the statute on the assumption that Congress used the English language in an ordinary way, the state of mind required is knowledge that one is violating a permit condition.

This approach has the virtue of attributing common sense and a rational purpose to Congress. *Cf. Longview Fibre Co. v. Rasmussen,* 980 F.2d 1307, 1311 (9th Cir.1992); *United States v. Martinez–Cano,* 6 F.3d

1400, 1405 (9th Cir.1993) (dissent). It is one thing to defy a permit limitation, but quite another to violate it without realizing that one is violating it. Congress promulgated a parallel statute making it a misdemeanor "negligently" to violate a permit condition or limitation. 33 U.S.C. § 1319(c)(1)(A). If negligent violation is a misdemeanor, why would Congress want to make it a felony to violate the permit without negligence and without even knowing that the discharge exceeded the permit limit? That does not make any sense. It would deter people from working in sewer plants, instead of deterring people from violating permits. All dischargers acting lawfully pursuant to a permit know that they are discharging pollutants. The presence or absence of that knowledge, which is the only mental element determining guilt under the panel's decision, has no bearing on any conduct Congress could have meant to turn into a felony. The only knowledge which could have mattered to Congress, the only knowledge which distinguishes good conduct from bad, is knowledge that the discharge violates the permit. That is what the statute says, "knowingly violates," not "knowingly discharges." There is no sensible reason to doubt that Congress meant what it said and said what it meant.

The panel reaches its surprising result in surprising ways. First, it says that the statute is ambiguous. "As with certain other criminal statutes that employ ·the term 'knowingly,' it is not apparent from the face of the statute whether 'knowingly' means a knowing violation of the law or simply knowing conduct that is violative of the law." *Weitzenhoff,* 1 F.3d at 1529. As explained above, a grammatical and sensible reading of the statute leaves no room for ambiguity. But for the sake of discussion, suppose that the statute is ambiguous, as the panel says. Then the rule of lenity requires that the construction allowing the defendant more liberty rather than less be applied by the courts. *Ratzlaf v. United States,* —— U.S. ——, —————, 114 S.Ct. 655, 662–63, 126 L.Ed.2d 615 (1994); *Hughey v. United States,* 495 U.S. 411, 422, 110 S.Ct. 1979, 1985, 109 L.Ed.2d 408 (1990). "[L]enity principles 'demand resolution of ambiguities in criminal statutes in favor of the defendant.'" *Ratzlaf,* —— U.S. at ——, 114 S.Ct.

at 663. The reason is the need for "fair warning." *Id.* (quoting *McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931) (Holmes, J.)).

Instead of applying the rule of lenity, as it was required to do, the panel, after identifying the ambiguity, said "[w]e turn, then, to the legislative history of the provision at issue to ascertain what Congress intended." That is not an appropriate way to resolve an ambiguity in a criminal law. "Because construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text." *Crandon v. United States,* 494 U.S. 152, 160, 110 S.Ct. 997, 1002–03, 108 L.Ed.2d 132 (1990). We cannot fairly put sewer plant workers in peril of prison if they do not read House and Senate committee reports.

Even if the use of legislative history were proper here, it would not support the panel's construction. The legislative history furnished a column of quotations and references in the opinion, but no genuine support for the panel's analysis. The opinion relies· on two quotations. The first says that criminal liability is to be imposed on any person who "*causes* a POTW [publicly owned treatment works] to violate any effluent limitation or condition in any permit." *Weitzenhoff,* 1 F.3d at 1529 (quoting S.Rep. No. 50, 99th Cong., 1st Sess. 29 (1985)) (emphasis in *Weitzenhoff*). That sounds as though it supports the panel's construction, but no doubt the panel overlooked the context of these words. If one looks up the quotation, one discovers that the Senate report was referring here to another provision, 33 U.S.C. § 1319(c)(2)(B), not to the provision at issue. The other provision has entirely different language, "knowingly introduces ... any pollutant ... which causes such treatment works to violate any effluent limitation or condition in a permit," as opposed to "knowingly violates ... any permit condition or limitation."

The second quotation, from a House report, says that the "knowingly violates" and "negligently violates" crimes are intended to penalize those who "knowingly or negligently violate or cause the violation" of certain laws.

H.R.Rep. No. 189, 99th Cong., 1st Sess. 29–30 (1985). This quotation does not help to answer the question before the panel. The opinion applies subtle grammatical analysis to the phrase in the House committee report, "or cause the violation," to draw an inference that knowing conduct which unknowingly violates a permit was meant to be turned into a felony. Careful grammatical analysis might better be applied to the law which Congress passed and the President signed. Even if inference from unexpressed intent in a committee report from one house were an appropriate means of turning innocent conduct into a felony, the inference from these words is too weak to carry the argument.

The panel's entire excursion into legislative history was fruitless and mistaken. The Supreme Court recently said in *Ratzlaf v. United States*, — U.S. —, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), "we do not resort to legislative history to cloud a statutory text that is clear. Moreover, were we to find § 5322(a)'s 'willfulness' requirement ambiguous as applied to [structuring], we would resolve any doubt in favor of the defendant." *Id.* at — – —, 114 S.Ct. at 662–63 (footnote omitted). Analogously, the legislative history cannot properly be used to cloud the legislative restriction of felonies to those permit violations in which the person has "knowingly violate[d]." Even if the statute were ambiguous, the rule of lenity would compel resolution of the ambiguity in favor of the defendant.

The panel then tries to bolster its construction by categorizing the offense as a "public welfare offense," as though that justified more aggressive criminalization without a plain statutory command. This category is a modernized version of "malum prohibitum." Traditionally the criminal law distinguishes between malum in se, conduct wrong upon principles of natural moral law, and malum prohibitum, conduct not inherently immoral but wrong because prohibited by law. Black's Law Dictionary 1112 (4th ed. 1951). To put this in plain, modern terms, any normal person knows murder, rape and robbery are wrong, and they would be wrong even in a place with no sovereign and no law. Discharging 6% more pollutants than one's permit allows is wrong only because the law says so. Substitution of the modern term "public welfare offense" for the traditional one, malum prohibitum, allows for confusion by rhetorical suggestion. The new term suggests that other offenses might merely be private in their impact, and therefore less serious. The older set of terms made it clear that murder was more vile than violating a federal regulation. The category of malum prohibitum, or public welfare offenses, makes the rule of lenity especially important, most particularly for felonies, because persons of good conscience may not recognize the wrongfulness of the conduct when they engage in it.

*Staples v. United States*, — U.S. —, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), reminds us that "offenses that require no *mens rea* generally are disfavored." *Id.* at —, 114 S.Ct. at 1797. *Mens rea* may be dispensed with in public welfare offenses, but the penalty is a "significant consideration in determining whether the statute should be construed as dispensing with *mens rea.*" *Id.* at —, 114 S.Ct. at 1802.

The potentially harsh penalty attached to violation of § 5861(d)—up to 10 years' imprisonment—confirms our reading of the Act. Historically, the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with *mens rea.* Certainly, the cases that first defined the concept of the public welfare offense almost uniformly involved statutes that provided for only light penalties such as fines or short jail sentences, not imprisonment in the state penitentiary.

As commentators have pointed out, the small penalties attached to such offenses logically complemented the absence of a *mens rea* requirement: in a system that generally requires a "vicious will" to establish a crime, imposing severe punishments for offenses that require no *mens rea* would seem incongruous. Indeed some courts justified the absence of *mens rea* in part on the basis that the offenses did not bear the same punishments as "infamous crimes," and questioned whether imprisonment was compatible with the reduced culpability required for such regulatory offenses.

*Id.* at —— ——, 114 S.Ct. at 1802–03 (footnote and citations omitted). If Congress makes a crime a felony, the felony categorization alone is a "factor tending to suggest that Congress did not intend to eliminate a *mens rea* requirement. In such a case, the usual presumption that a defendant must know the facts that make his conduct illegal should apply." *Id.* at ——, 114 S.Ct. at 1804. In the case at bar, "the facts that make his conduct illegal" are the permit violations, not the discharges of pollutants. Discharge of pollutants was licensed by the federal government in the NPDES permit. Under *Staples,* it would be presumed, even if the law did not plainly say so, that the defendant would have to know that he was violating the permit in order to be guilty of the felony.

Precedent cuts strongly against the panel's decision. Two Supreme Court decisions came down this term which should have caused us to rehear the case.

*Ratzlaf v. United States,* —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), reversing a decision of ours, holds that to commit the crime of "willfully violating" the law against structuring cash transactions to evade currency transaction reporting requirements, the defendant has to know that his conduct is unlawful. It is not enough that he is engaging in the cash transactions with a purpose of evading currency transaction reporting requirements. *Id.* at ——, 114 S.Ct. at 657. Ignorance of the law generally is no excuse, but "Congress may decree otherwise." *Id.* at ——, 114 S.Ct. at 663. The Court was concerned that a narrower reading of the mental element of the crime would criminalize conduct committed without the criminal motive with which Congress was concerned. *Id.* at ——, 114 S.Ct. at 661.

At issue in *Staples v. United States,* —— U.S. ——, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), was a statute which made it a felony to possess an unregistered "firearm." The statute defined "firearm" to include a fully automatic gun, which would fire more than one bullet on a single pull of the trigger, but not a semiautomatic. The defendant possessed a fully automatic gun, but testified that he did not know it would fire more than one bullet with a single trigger pull. The trial judge had instructed the jury that his

ignorance did not matter, so long as the government proved he possessed "a dangerous device of a type as would alert one to the likelihood of regulation." The Supreme Court again rejected dilution of the mental element of the crime. The Court explained that unlike the hand grenades in *United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), semiautomatics are innocently possessed by many people. Nor was knowledge· that guns are regulated enough to require the owner to ascertain compliance with the regulations at his peril. That might do for a misdemeanor, but the felony status of the offense suggested a more plainly criminal mental state. Nor would the dangerousness of guns suffice to weaken the mens rea requirement:

> If we were to accept as a general rule the Government's suggestion that dangerous and regulated items place their owners under an obligation to inquire at their peril into compliance with regulations, we would undoubtedly reach some untoward results. Automobiles, for example, might also be termed "dangerous" devices and are highly regulated at both the state and federal levels. Congress might see fit to criminalize the violation of certain regulations concerning automobiles, and thus might make it a crime to operate a vehicle without a properly functioning emission control system. But we probably would hesitate to conclude on the basis of silence that Congress intended a prison term to apply to a car owner whose vehicle's emissions levels, wholly unbeknownst to him, began to exceed legal limits between regular inspection dates.

*Staples,* —— U.S. at —— —— ——, 114 S.Ct. at 1801–02.

Nor does our own precedent support the panel's result. Our case most closely in point goes the other way. It is a crime to "knowingly transport[ ] or cause[ ] to be transported any hazardous waste identified or listed under this subchapter to a facility which does not have a permit." 42 U.S.C. § 6928(d)(1). Must the government prove that the defendant knew the facility did not have a permit, or can a person be convicted if he knows he is transporting, even if he honestly and rea-

sonably believes that the facility does have a permit? We held in *United States v. Speach,* 968 F.2d 795 (9th Cir.1992), that the government must prove that the transporter knew the facility did not have a permit. "Removing the knowledge requirement would criminalize innocent conduct...." *Id.* at 796.

The panel's suggested distinctions of *Speach* do not justify the difference in result. In *Speach,* we construed an ambiguous statute to require more rather than less knowledge of what made the conduct wrong, because diluting the knowledge requirement could ensnare the innocent. Likewise here. If a sewage worker pulls the switch to discharge sludge into the sea, because that is his job and the plant has a federal permit to discharge sludge into the sea, the panel opinion makes him guilty of a felony, if unbeknownst to him the particular discharge will violate the permit limits. *Speach* says that a narrow construction of the knowledge requirement in that case would "criminalize innocent conduct." 968 F.2d at 796. The statute could be read literally either way, so *Speach* read it, consistently with the rule of lenity, in the way which required that the defendant know of the absence of a permit, not just that he or she was transporting a hazardous waste. The same reasoning applies in *Weitzenhoff,* if the statute is ambiguous at all.

The panel cites *United States v. International Minerals & Chem. Corp.,* 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971), and *United States v. Hoflin,* 880 F.2d 1033 (9th Cir.1989), in support of its reading. *International Minerals* was a pre-*Ratzlaf* misdemeanor case. Because of the syntactically similar statute at issue in that case, it is the strongest authority for the panel's decision and raises the most serious question for my own analysis. It held that a shipper of sulfuric acid could be convicted of violating a statute applying to those who "knowingly violate[ ]" regulations governing shipments of corrosive liquids, regardless of whether he had knowledge of the regulations. *International Minerals* expressly limits its holding to "dangerous or deleterious devices or products or obnoxious waste materials." 402 U.S. at 565, 91 S.Ct. at 1702. The Court distinguished materials not obviously subject to regulation:

Pencils, dental floss, paper clips may also be regulated. But they may be the type of products which might raise substantial due process questions if Congress did not require ... "*mens rea*" as to each ingredient of the offense. But where, as here ..., dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation.

*Id.* at 564–65, 91 S.Ct. at 1701–02. *International Minerals* would have much persuasive force for *Weitzenhoff,* because of the grammatical similarity of the statute, if (1) the Clean Water Act limited pollutants to "dangerous or deleterious devices or products or obnoxious waste materials;" (2) the crime was only a misdemeanor; and (3) *Staples* had not come down this term. But all three of these conditions are contrary to fact. The pollutants to which the Clean Water Act felony statute applies include many in the "pencils, dental floss, paper clips" category. Hot water, rock, and sand are classified as "pollutants" by the Clean Water Act. *See* 33 U.S.C. § 1362(6). Discharging silt from a stream back into the same stream may amount to discharge of a pollutant. For that matter, so may skipping a stone into a lake. So may a cafeteria worker's pouring hot, stale coffee down the drain. Making these acts a misdemeanor is one thing, but a felony is quite another, as *Staples* teaches.

In *Hoflin,* the statute made it a crime to: (2) knowingly ... dispose[ ] of any hazardous waste....

(A) without having obtained a permit ... or

(B) in knowing violation of [a permit condition].

We held that the "stark contrast" between the presence of "knowing" in subsection (B) and its absence in subsection (A) implied that knowledge of the absence of a permit was not an element of the subsection (A) crime. It was apparent from the nonparallel syntax of the statute that the word "knowing" in the introductory line modified only "disposes," not "without having obtained a permit." The

statute in *Hoflin* is not like the one before us. The panel unfortunately did not make the careful analysis of the syntax of the statute in our case that was made in *Hoflin.*

The panel, finally, asserts that as a matter of policy, the Clean Water Act crimes "are clearly designed to protect the public at large from the dire consequences of water pollution." That is true, but the panel does not explain how the public is to be protected by making felons of sewer workers who unknowingly violate their plants' permits. Provision for sanitary sewage disposal is among the most ancient laws of civilization. Deuteronomy 23:12-13. Sewage workers perform essential work of great social value. Probably nothing has prevented more infant mortality, or freed more people from cholera, hepatitis, typhoid fever, and other disease, than the development in the last two centuries of municipal sewer systems. *See* W.H. Corfield, The Treatment and Utilisation of Sewage 17–27 (1871). Sewage utility workers perform their difficult work in malodorous and dangerous environments. We have now imposed on these vitally important public servants a massive legal risk, unjustified by law or precedent, if they unknowingly violate their permit conditions.

Nor is the risk of prison limited to sewage plant workers. It applies to anyone who discharges pollutants pursuant to a permit, and unknowingly violates the permit. The panel suggests that criminalizing this innocent conduct will protect the public from water pollution. It is at least as likely that the increased criminal risk will raise the cost and reduce the availability of such lawful and essential public services as sewage disposal. We should not deprive individuals of justice, whether the judicial action would serve some desirable policy or not. It is by no means certain that the panel's construction will advance the underlying policy it attributes to Congress. We should apply the words Congress and the President promulgated as law, leaving the difficult policy choices to them.

We undermine the foundation of criminal law when we so vitiate the requirement of a criminal state of knowledge and intention as to make felons of the morally innocent.

The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory "But I didn't mean to".... Unqualified acceptance of this doctrine by English common law in the Eighteenth Century was indicated by Blackstone's sweeping statement that to constitute any crime there must first be a "vicious will."

*Morissette v. United States,* 342 U.S. 246, 250–51, 72 S.Ct. 240, 243–44, 96 L.Ed. 288 (1952) (footnote omitted). As Justice Jackson explained, "Consequences of a general abolition of intent as an ingredient of serious crimes have aroused the concern of responsible and disinterested students of penology. Of course, they would not justify judicial disregard of a clear command to that effect from Congress, but they do admonish us to caution in assuming that Congress, without clear expression, intends in any instance to do so." *Id.* at 254 n. 14, 72 S.Ct. at 246 n. 14.

Congress made it a serious felony "knowingly" to violate permit limitations on discharge of pollutants. The harsh penalty for this serious crime must be reserved for those who know they are, in fact, violating permit limitations.